759 A.2d 1091

**BALTIMORE HARBOR CHARTERS, LTD.**

v.

**Frank AYD, III.**

**No. 0153, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 27, 2000.

190

C. William Michaels, Baltimore, for appellant.

Steven D. Shemenski (Turnbull, Mix & Farmer, on the brief), Townson, for appellee.

Argued before MOYLAN, EYLER and ADKINS, JJ.

ADKINS, Judge.

In this employment dispute case, Baltimore Harbor Charters, Ltd. ("BHC"), appellant, contends that the Circuit Court for Baltimore City erred in denying its motion for judgment notwithstanding the jury's verdict in favor of its former employee, Frank Joseph Ayd, III, appellee. BHC also contends that the court erred by failing to credit certain monies. Ayd cross appeals, alleging that the trial court erred in ordering a remittitur, in excluding certain evidence, and in not allowing the jury to consider whether BHC violated the Maryland Wage Payment and Collection Law.

## FACTS AND LEGAL PROCEEDINGS

Ayd started a charter boat company. In 1989, when Suzanne Edwards joined the business as an officer, general manager, and sales agent, they incorporated BHC. A year later, Ayd married, and his wife became the third BHC stockholder. These three resolved to pay Ayd $200 per month to perform management and consulting services. In late 1993,

Ayd and his wife began divorce proceedings. In November 1993, Edwards decided she wanted to retire. Ayd and Edwards began looking for a buyer for BHC.

In February 1994, Robert Berman bought the BHC stock and became BHC's sole shareholder. Berman became vice president of BHC, Ayd became president, and Ayd's sister, Rita O'Brennan, became the corporate secretary. Ayd continued his employment with BHC and his management of the company's day-to-day operations. In March 1994, BHC purchased a vessel named *The Royal Blue*. Ayd directed and managed extensive modifications to *The Royal Blue* over a period of five months. After the Coast Guard certified the vessel some months later, Ayd captained it.

BHC contends that from the time BHC employed Ayd until Ayd resigned on September 9, 1996, Ayd was to be paid $200 per month for administrative services and $200 to captain. Ayd, however, contends that he was to receive $30,000 annually to manage and act as a sales representative for BHC, plus a percentage of the tips for each charter he captained. He based his contention in part on a written document purporting to be an "Informal Action" of the BHC directors establishing Ayd's weekly salary as $576.92.

Ayd also testified that at the time this salary was set, the parties did not contemplate the volume of work Ayd performed on *The Royal Blue*, and that he had performed extensive labor on the vessel in anticipation that he would be able to re-purchase controlling interest in the company. Ayd testified that Berman promised that after he had been repaid the money he invested in the company, he would sell Ayd a controlling interest. There was also evidence that *The Royal Blue* increased in value as a result of the improvements that Ayd made or directed. The vessel was purchased for $365,-000, and BHC invested $57,000 in repair and restoration. Anthony Fotos testified that after the vessel was restored and certified, Berman offered *The Royal Blue* to him for $500,000, and that he would have paid that amount for the vessel.

Berman testified that despite these improvements, the company lost money. In an effort to establish why, Berman resolved to take over responsibility for the company's finances. In the spring of 1996, Berman asked Ayd to turn over the books, but felt that Ayd "stalled" him by asserting that he was too busy to do so. In August, Berman discovered that the accounts and signature cards on the company bank accounts had never been changed to reflect his ownership. Berman closed the account and opened a new company account. When he confronted Ayd about the bank records, Berman did not believe Ayd's response that he knew nothing about the situation. Shortly thereafter, Ayd resigned, effective September 9, 1996.

On July 9, 1997, Ayd filed a complaint against BHC alleging breach of contract, *quantum meruit*, unjust enrichment, and a violation of Maryland's Wage Payment and Collection Law. Ayd alleged, *inter alia*, that he was to be paid $576.92 weekly salary plus a $40 tip for each charter trip. He had only been paid, he complained, $9,861.55 during the period of February 1994 to September 1996. The alleged unpaid compensation totaled $91,048.83. BHC counterclaimed, alleging breach of fiduciary duty, conversion, and trespass to chattel.

The case was tried before a jury. At the end of Ayd's case-in-chief, both parties made motions for judgment. Both motions were denied. After BHC presented its defense, Ayd presented rebuttal evidence. After Ayd's rebuttal case, although Ayd renewed his motion for judgment, BHC did not renew its motion. The jury awarded Ayd $76,099.33 on his breach of contract claim, and made an identical award on his unjust enrichment claim. On BHC's counterclaim for breach of Ayd's fiduciary duty, the jury awarded BHC $4,000 in compensatory damages.

BHC filed a motion for new trial, judgment notwithstanding the verdict, and remittitur. After a hearing, the court ruled that unless Ayd agreed to accept a remittitur, it would grant a new trial. When Ayd accepted the remittitur, the court reduced the jury's award by $76,099.33 (the amount of the

unjust enrichment award), plus $9,861.55 for wages Ayd conceded that BHC had paid him. Thus, the judgment became $66,237.78. Both parties now appeal.

## DISCUSSION

### I.

### JNOV

BHC first contends that the trial court erroneously denied its motion for judgment notwithstanding the verdict ("JNOV"). Ayd responds that BHC lost the right to move for JNOV because it failed to make a motion for judgment at the close of all the evidence, as required by Maryland Rule 2–532. In its reply brief, BHC concedes that it failed to renew the motion at the close of all the evidence, but contends that its motion at the end of Ayd's case-in-chief was sufficient to preserve its right to make a motion for JNOV. BHC further argues that when Ayd moved for judgment, the judge denied the motion and "[t]his denial also extended to BHC's own renewed motion, as indicated by the Court." Neither the record nor the law support BHC's contentions.

Rule 2–519 governs motions for judgment, and states in pertinent part:

> (a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.
>
> * * *
>
> (c) **Effect of Denial.** A party who moves for judgment at the close of the evidence offered by an opposing party may offer evidence in the event the motion is not granted,

without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the party withdraws the motion.

Rule 2–532, relating to motions for JNOV, states in pertinent part:

(a) **When permitted.** In a jury trial, a party may move for [JNOV] only if that party made a motion for judgment at the close of all the evidence. . . .

(b) **Time for filing.** . . . If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for [JNOV] if the verdict is against the moving party. . . .

 In interpreting the Rules of Procedure, we apply the same rules of construction that we use to interpret statutes. *See Kerpelman v. Smith, Somerville & Case, L.L.C.,* 115 Md.App. 353, 357, 693 A.2d 357, *cert. denied,* 346 Md. 241, 695 A.2d 1229 (1997). The most basic rule of statutory construction is that courts should endeavor to "ascertain and effectuate legislative intent." *Jones v. State,* 336 Md. 255, 260, 647 A.2d 1204 (1994). Here, we are required to "ascertain and effectuate" the intent of the Court of Appeals in adopting the language in both 2–519 and 2–532 requiring that *all* the evidence be completed before a party may move for judgment or JNOV in a jury trial. A plain reading of both rules shows that these motions must be made at the close of *all* evidence.

 In this case, BHC made its motion for judgment at the close of Ayd's case-in-chief. That motion was denied. At the close of BHC's defense case, Ayd also moved for judgment. When Ayd's motion was denied, BHC requested that the case be reopened to introduce "some pieces of evidence," and Ayd objected. The court reopened the case, stating: "I'm going to allow you to reopen your case and the Motion for Judgment would have [to] come after." After additional documents were moved into evidence, Ayd renewed his motion for judgment on the counterclaim. Ayd then took the stand to offer rebuttal testimony. After the close of Ayd's rebuttal case, Ayd re-

newed his motion for judgment on the counterclaim, and again, it was denied. BHC did not renew its motion.

Under Rule 2–532(a), a motion for JNOV can be made "only if that party made a motion for judgment at the close of *all* of the evidence. . . ." Here, the record is clear that BHC did not move for judgment at the close of all of the evidence. We find no merit in BHC's argument that the denial of Ayd's renewed motion for judgment should be construed also as a denial of BHC's earlier motion, which had already been denied, and which was not renewed. When BHC made its motion at the end of Ayd's case-in-chief, the court clearly denied that motion. After Ayd presented his rebuttal testimony, and closed his rebuttal case, the following dialogue occurred:

[Counsel for Ayd]: I believe I have to make a Motion again at this time to incorporate the grounds upon which I stated before for the record. Your Honor, I can renumerate them or I believe you can allow me to just reincorporate it. The Court: That's fine.

[Counsel for Ayd]: As I've previously stated.

The Court: And, I'm going to deny your Motion at this time and let the case go to the jury as we discussed previously. Anything else?

[Counsel for BHC]: No, your Honor.

Contrary to BHC's contention, the transcript clearly reveals that BHC did not suggest that its motion be renewed or reincorporated, and the court did not suggest that its denial of Ayd's motion was also a denial of a motion by BHC. Accordingly, because BHC failed to follow the dictates of Rule 2–532(a) that a motion for judgment must be made at the close of all the evidence in order to preserve the right to move for a JNOV, we hold that the trial court did not err in denying BHC's motion for JNOV.

## II.

### Remittitur

In his cross-appeal, Ayd argues that the court erred in its remittitur in two respects: (1) it should not have ordered a

remittitur of the jury's verdict for unjust enrichment; and (2) the remittitur should not have given BHC a credit for any of the wages Ayd admits that he was paid. In its appeal, BHC contends that the trial court erred in crediting only the $9,861.55 in wages that Ayd admitted in his complaint, rather than the amount of the wages reflected in the W–2 forms that were submitted into evidence. We affirm the trial court in its decision regarding remittitur, in all respects, and explain.

 A trial court has the power to order a remittitur if it determines that the verdict awarded by the jury is " 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.' " *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988). Technically speaking, in ordering a remittitur, a trial court does not reduce the verdict; rather, the court orders a new trial unless the winning party will agree to accept a lesser sum fixed by the court, instead of the jury verdict. *See id.* Further, a trial court has broad discretion in granting a remittitur and the decision is reviewable, on an abuse of discretion standard, only under extraordinary circumstances. *See Franklin v. Gupta,* 81 Md.App. 345, 362, 567 A.2d 524, *cert. denied,* 319 Md. 303, 572 A.2d 182 (1990).

## A.

### Ayd's Challenge To The Remittitur

 After the jury verdict, BHC filed a motion for a new trial, JNOV, and remittitur, contending that the award for unjust enrichment duplicated the award for breach of contract, and that BHC was entitled to a set-off for the wages already paid. The trial court agreed, and fully addressed these issues at the motion hearing.

[I have] to consider the case as a whole. Now, it is clear to this [c]ourt that there was sufficient evidence in the record for the jury to find unjust—unjust enrichment, but not under the theory that [appellee's] counsel promotes, that is that it was services rendered during the time of what the jury found to be an employment contract. Therefore, hav-

ing looked at the evidence as a whole, my judicial conscience is shocked because of the excessive amount, and therefore, unless [Ayd] agrees to accept a remittitur of reducing the judgment ... I will grant a new trial. ... [L]et me explain my numbers since its not a number that either party has suggested. The [c]ourt agrees with [BHC] that the number the jury found, $76,099.33 ... was a duplicative award. It was awarded twice. It—it's just too specific and unusual a number for it to be a number pulled out of the air. And therefore, the [c]ourt feels that the jury misunderstood unjust enrichment and in fact awarded [Ayd] the judgment for breach of contract twice. But the [c]ourt does not feel that the W–2 forms accurately reflect the income that was received pursuant to that contract. And in fact, a W–2 form can reflect income from all kinds of sources that have nothing to do with your major employment. In the Complaint, however, [Ayd] says that he was paid $9,861.55 and therefore, the [c]ourt feels that it is appropriate for that amount to be deducted from the amount that was given as a judgment in the breach of contract count. ... The [c]ourt is going to reduce that as it was upon considering the case as a whole, shocked by the fact that they gave—they clearly misunderstood the quantum meruit versus unjust enrichment as described by defense counsel in her pleadings and therefore, I'm going to reduce it. ... [B]ecause [appellee] concedes that he was paid $9,861.55 under the contract, I will further reduce the judgment to $66,237.78.

\* \* \*

[G]iven all the facts in this case, and the fact that I do think that the jury got confused because of the odd number that they picked for both [breach of contract and unjust enrichment claims] and because in the [c]ourt's mind, unjust enrichment in [Ayd's] favor would have resulted in a much smaller number. I don't know what the number would have been but it wouldn't have been $76,099.33 that's why I'm granting—conditionally granting the motion for a new trial.

Thus, the hearing transcript clearly shows that trial court recognized the peculiarity in the jury awarding precisely the same amount of dollars and cents for both the breach of contract and the unjust enrichment claims, and concluded that the jury became confused about how to deal with the unjust enrichment claim.

Ayd proffers a different rationale for why the two awards were identical in amount. He posits that the unjust enrichment award represents the increased value of *The Royal Blue* that resulted from his efforts. He explains that *The Royal Blue* increased in value by $78,000 after repairs and restoration, and that the increase exceeds the amount that BHC paid out-of-pocket for those repairs.[1] He argues that his labor on the vessel was not covered by his employment agreement because BHC had not yet purchased the boat at the time he commenced work and agreed upon his compensation.

Although Ayd's rationale might explain how the jury could have arrived at a sum of $78,000, it does not explain how the jury could have arrived at the exact sum the jury awarded for breach of contract—$76,099.33. The trial court considered the verdict excessive because the duplicated amount suggested that the jury did not rest the unjust enrichment award on an increase in value of the vessel, but rather on the same damages represented by the breach of contract. This interpretation is a reasonable one.

It is not necessary that the trial court's view of the verdict be the *only* rational view. An abuse of discretion occurs only "it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Rolley v. Sanford,* 126 Md.App. 124, 131, 727 A.2d 444 (1999)(*quoting North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994)). In this case, the trial court's decision represented a fair and reasonable assessment of the verdict—as a verdict that was excessive because

---

1. Ayd reaches this figure by subtracting the purchase price ($365,000), and out-of-pocket costs of repair ($57,000) from the $500,000 value testified to by Fotos.

the jury got confused and duplicated the award for breach of contract damages as an award for unjust enrichment. We cannot say that the trial court abused its discretion in granting a remittitur for the unjust enrichment award.

▆▆ Nor do we agree with Ayd's contention that the trial court abused its discretion in crediting to BHC, as part of the remittitur, the wages that Ayd admitted he had received from BHC. As BHC argued in his motion for new trial, JNOV, and remittitur, the award of $76,099.33 was "99.9% of what was due under the contract found in Plaintiff's Exhibit No. 3." Ayd worked for BHC from February 25, 1994 until September 9, 1996, a period of 132 weeks, at the alleged salary of $576.92 per week. Using that salary, his total wages for that period would be $76,153.44. The judgment on the breach of contract count was $76,099.33. In his complaint, Ayd acknowledged that BHC had paid him $9,861.55. The jury verdict on Ayd's breach of contract claim obviously did not take into account any amounts paid to Ayd—it represented almost 100% of the salary that Ayd claimed he had earned during his employment. Thus, it was reasonable for the trial court to conclude that the jury verdict on the contract count was excessive.

Ayd argues that the figure of $9,861.55 did not coincide with any amount introduced into evidence, and for that reason, was not the proper basis for remittitur. The W–2 forms introduced into evidence showed $38,861.55 in employee compensation, none of which was credited to BHC by the jury. The trial court, in granting the remittitur, did not credit this whole amount. It may have chosen the lesser figure because it considered that some of the compensation was attributable to administrative fees, minister fees (for performing weddings), or captain's fees.

During the trial, Ayd introduced W–2 forms he received from BHC showing the following income from "[w]ages, tips [and] other compensation": in 1994—$3,461.55; 1995—$23,-000; 1996—$12,400. Ayd also introduced a 1996 Form 1099 from BHC showing "[n]onemployee compensation" in the amount of $2,888.33. When questioned regarding the 1994

W–2, Ayd testified that the 1994 income "would have been captain's fees [and] some minister's fees, ... [a]nd it would have also included from earlier in the year some of the salary that was paid, the administrative salary." In response to the same question regarding the 1995 income, he stated: "That would have been the captain's fees, minister's fees, administrative fees. I don't believe there w[ere] any other things encompassed within that.... [W]e started to have a positive cash flow and I started to catch up on a lot of the administrative fees and crew fees that I hadn't been paid."

The greatest amount that could have been administrative fees, however, was $6,000—representing a fee of $200 per month for 30 months from February, 1994 to September, 1996. This would leave a balance of $32,861.55 for salary, captain's fees, and minister fees. Ayd admitted in his complaint that he was paid a total of "$9,861.55 in salary and administrative fees" during the period that was the subject of the suit. This amount was not only admitted by Ayd, but was obviously included among the W–2 forms introduced into evidence. Thus, the court chose the lesser amount because the jury was free to believe that a portion of the compensation showed on the W–2 forms was attributable to minister's fees, or captain's fees or for some other reason did not accurately represent salary and administrative fees paid to Ayd. Given Ayd's admission in his complaint, however, there was no question that $9,861.55 had been paid, and that it should have been credited against the total amount of salary allegedly due under the contract. Accordingly, we do not think it was an abuse of the trial court's discretion to credit this amount against what BHC owed for salary in granting the remittitur.

### B.

### BHC's Challenges To The Remittitur

■ BHC contends that the full $38,861.55 shown on the W–2 forms should have been credited against the jury's award for breach of contract, and that the trial court erred in not doing so as part of the remittitur. Again, we cannot say that

the trial court abused its discretion in refusing to credit the entire amount shown on the W–2 forms produced by BHC because the W–2 forms, according to Ayd's testimony, included income from captaining and from minister fees, as well as salary and administrative fees.

The exact amount of the minister's fees and captain's fees was not proven. Ayd testified that after *The Royal Blue* was certified, he was paid a "captain's fee", for serving as captain when the vessel went on a charter trip. This fee was separate and apart from his salary and administrative fee. For captaining, he was to be paid $200 per charter, plus 20% of the tip paid by the customer. Generally, the tip was 15% of the charter fee. Ayd testified that he had not been paid his tip money because "[he] wanted to get money to Mr. Berman to get him paid off and so I just didn't pay myself that money and took care of other obligations and improvements to the vessel . . . ." There was no testimony about the amount of the minister fees.

The jury had sufficient evidence from which it could conclude that the $38,861.55 amount shown as compensation on the W–2 forms included compensation other than the salary that was the subject of the complaint, or the $200 per month administrative fees. In light of the evidence, the trial court's decision to include only that amount of salary and administrative fee that Ayd admitted that he had received was logical and reasonable. We find no error in the trial court's decision regarding the remittitur.

## III.

### Maryland Wage Payment & Collection Law

In his cross-appeal, Ayd argues that the trial court erred in dismissing his claim for treble damages under the Maryland Wage Payment and Collection Law ("the Act"), Md.Code (1991, 1999 Repl.Vol.), §§ 3–501–3–509 of the Labor and Employment Article ("LE"). The principal purpose of the private remedy provided under the Act was "to provide a vehicle for employees to collect, and an incentive for employers to pay,

back wages." *Battaglia v. Clinical Perfusionists, Inc.,* 338 Md. 352, 364, 658 A.2d 680 (1995). The Act defines "wage" as "all compensation that is due to an employee for employment," and specifically includes any bonus, commission, fringe benefit or "any other remuneration promised for service." LE § 3–501(c). Section 3–502 of the Act is a "regular pay" provision generally requiring employers to pay employees "at least once every two weeks or twice in each month." LE § 3–502(a)(1)(ii). But there is a specific exception permitting "an employer [to] pay an administrative, executive, or professional employee less frequently...." LE § 3–502(a)(2).

The Act also requires prompt payment of wages after termination, by specifying when an employer must pay wages due for work performed before termination of employment. Section 3–505 provides that "[e]ach employer shall pay an employee ... all wages due for work that the employee performed before the termination of employment, **on or before the day on which the employee would have been paid the wages if the employment had not been terminated.**" LE § 3–505 (emphasis added).

To enforce both of these provisions, the Act creates a remedy if "an employer fails to pay an employee in accordance with" either the "regular pay" requirements of section 3–502 or the "prompt pay after termination" requirements of section 3–505. *See Battaglia,* 338 Md. at 363, 658 A.2d 680. Section 3–507.1 provides:

(a) *In general.*—[I]f an employer fails to pay an employee in accordance with § 3–502 or § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

(b) *Award and costs.*—If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage....

Thus, employers risk liability for treble damages if they (1) fail to pay wages owed to a terminated employee within two weeks after the date he would been paid if his employment had continued, and (2) have no bona fide reason for withholding those wages. *See Admiral Mortgage v. Cooper,* 357 Md. 533, 540–41, 745 A.2d 1026 (2000).

At trial, Ayd claimed that because BHC failed to timely pay his wages, and had no "bona fide" reason for doing so, he was entitled to seek and obtain treble damages. In dismissing Ayd's claim, the court suggested that the Act was intended to cover employees with a standard weekly or regular salary and with certain salary due and unpaid by the employer at the time of termination of employment.

> It's in the [c]ourt's view that the [Act] was not designed to cover the situation as outlined in [Ayd's] case. The [Act] contemplates (1) a regular pay period, (2) where an employee is generally paid bi-weekly, and (3) in check or currency. In a light most favorable to [Ayd], the facts in this case show, that there [were] no regular pay periods.... [Ayd] controlled [BHC's] accounts up to and including the date, in 1996, when [BHC] took over the books. [Ayd] had the ... control to write payroll checks himself and to pay himself whenever the cash was available. His testimony is that he voluntarily deferred during the time that he worked with [BHC], did not take any commissions or tips which may have been due him, voluntarily. The only thing of value that was consistently used [by Ayd that could be construed as compensation] during the period of 1994 to 1996 was a place to stay [rent free]. That is the charter boat itself, and it is the view of this [c]ourt that these are not ... the types of situations that were covered by the [Act].

Ayd argues that the trial court erred in concluding that he fell outside the scope of the Act, and in not allowing the jury to consider whether BHC had violated the Act and whether Ayd should be awarded treble damages. In response, BHC posits three reasons why we should affirm the trial court's ruling that the Act does not apply to Ayd. We find none of

BHC's arguments persuasive, and conclude that the trial court did err in dismissing Ayd's claim under the Act.

First, BHC contends that the trial court correctly determined that Ayd was not covered by the Act, because the only pattern of wage payment was "an arrangement of $200 per month and $200 per charter" such that "[t]he situation does not come within the statute's language regarding payment of executive or administrative employees less than twice per month." The scope of the Act is a matter of statutory construction subject to our complete review. Legislative intent must be sought in the first instance in the actual language of the statute. *See Board of License Comm'rs v. Toye,* 354 Md. 116, 122, 729 A.2d 407 (1999). When "the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, ... courts will not look beyond the words of the statute itself to determine legislative intent." *Id.*

BHC's focus on section 3–502 is misplaced. Although that section allows employers to pay "administrative, executive, or professional" employees less than biweekly or bimonthly, it does not allow employers who do so to avoid the prompt payment after termination requirements of section 3–505. Consistent with the purpose of the Act, the unambiguous terms of section 3–505 protect employees who are not paid on a biweekly, bimonthly, or other regularly defined pay schedule. Section 3–505 is worded broadly to encompass all terminated employees without regard to the regularity or length of that employee's pay period. It simply and clearly requires employers to pay terminated employees "on or before the day" that the employee's next paycheck would have been issued if the employment had continued. Similarly, section 3–507.1 has no language limiting the scope of its remedy based on the frequency or regularity of the terminated employee's pay period. If the Legislature had intended to restrict the prompt payment after termination requirement of section 3–505 or the enforcement remedy of section 3–507.1 to employees who are paid on a specified pay schedule, it could easily have done so.

It did not. We hold that administrative, executive, and professional employees, who under the Act may be paid irregularly or less frequently than the standard two-week pay period, are entitled to prompt payment of wages upon termination in accordance with section 3–505, and are entitled to the enforcement remedies provided in section 3–507.1.

This construction is consistent with the Court of Appeals' recent discussion of section 3–505 in *Admiral Mortgage v. Cooper, supra.* In that case, the Court applied sections 3–505 and 3–507.1 to a mortgage loan officer whose wages included commissions payable after the closing of a loan that he had generated or developed. *See Admiral Mortgage,* 357 Md. at 540, 745 A.2d 1026. The *Admiral Mortgage* Court concluded that after the employment terminated, section 3–505 applied to the payment of such irregularly occurring commissions. "Under that statute, if [the employee] was due a commission on the closing of a loan generated or developed by him, the commission should have been paid, at the latest, when the loan was closed. Section 3–507.1 gives an employee a civil cause of action to recover wages withheld in violation of [section] 3–505." *Id.* at 540–41, 745 A.2d 1026.

BHC's second argument against Ayd's claim under the Act is that Ayd's position as an executive employee in charge of the company checkbook, who wrote his own paychecks during most of his employment, places him outside the scope of the Act. The Act does not include a definition of the term "employee," but it does define "employer" broadly as "includ[ing] any person who employs an individual in the State." BHC has not—and cannot—point to any language in either section 3–505 or section 3–507.1 that excludes employees handling the employer's checkbook or payroll. Nor do either of these sections exempt a particular class of employees, such as the "executives" that BHC suggests should be excluded. Our review of the legislative history of the statute revealed no indication that the Legislature contemplated excluding such a potentially large class of employees from the protections afforded by the Act. *See* 1993 H.B. 1006 and S.B. 274 (legislative

history includes committee reports, amendments, written and oral testimony).

In contrast to section 3–502, which explicitly exempts "administrative, executive, [and] professional employees" from the biweekly/bimonthly terms of the regular pay provisions, there are no analogous limitations or exceptions in either the prompt payment after termination or the enforcement provisions of the Act. Under the established statutory construction principle of *"expressio unius est exclusio alterius"* (the expression of one thing is the exclusion of another), we may consider the Legislature's explicit exception of "administrative, executive, or professional employees" in section 3–502 as evidence that the absence of a similar exception in sections 3–505 and 3–507.1 reflects the Legislature's intent that those provisions would cover all employees. *See State v. Wiegmann*, 350 Md. 585, 593, 714 A.2d 841 (1998); *Cox v. Prince George's County*, 86 Md.App. 179, 194, 586 A.2d 43 (1991). This construction promotes the purpose of the Act, by extending its prompt payment and enforcement remedies to all employees without regard to the nature of their employment duties.

Ayd's control over the checkbook might support an estoppel defense if Ayd were claiming treble damages based on his own failure to pay himself every two weeks or twice per month in violation of section 3–502. But Berman took control of the checkbook two weeks before Ayd's employment terminated. Even if Ayd voluntarily deferred his salary while employed, that deferral does not wipe out the protection afforded to him under section 3–505. No contention has been made, nor evidence presented, that Ayd agreed to waive, or acted inconsistently with, his entitlement to be paid in full as a result of the termination, pursuant to section 3–505.

Finally, BHC argues that the trial court correctly determined that section 3–507.1 of the Act precludes an award of treble damages because there was a "bona fide dispute" over the wages Ayd claimed. The problem with BHC's argument is that it was not the trial judge's job to determine whether

there was a violation or a bona fide dispute. As the Court of Appeals recently made clear in *Admiral Mortgage, supra,* it is the jury's task to decide whether the employer violated the prompt payment after termination provisions of the Act without any bona fide reason for doing so, and, if so, whether the employee should be awarded an amount not exceeding three times the wage. *See Admiral Mortgage,* 357 Md. at 551, 745 A.2d 1026.

A trial judge can only remove a claim under the Act from the jury's determination if the employee fails to introduce facts that would allow an inference that the employer had no bona fide reason for failing to pay wages upon termination. In this case, we find sufficient evidence in the record to allow, but not require, such an inference. The evidence allows the inference that Berman, knowing he had agreed to pay Ayd the $30,000 annual salary, intentionally refused to pay it, and lied about having agreed to do so. This evidence would support a recovery under section 3–507.1. As the Court of Appeals recently recognized in *Admiral Mortgage, supra,* when the record shows that "a significant credibility issue" permeated the employer's entire defense case, a trial judge cannot determine as a matter of law that the employer withheld wages as a result of a bona fide dispute, and "the issue [is] properly reserved for resolution by the jury." *Id.* at 544, 745 A.2d 1026.

The trial court erred in dismissing Ayd's claim under the Wage Payment and Collection Law. We shall vacate the judgment on Ayd's complaint, and remand for the limited purpose of trying Ayd's claim under the Act, in accordance with this opinion. In doing so, we wish to provide some guidance for the litigants, counsel, and trial court. Having affirmed the judgment on BHC's counterclaim, the jury's verdict on the breach of contract claim, and the trial court's remittitur on Ayd's breach of contract and unjust enrichment claims, we remand only for a determination of the Wage Payment and Collection Law claim. At the time of trial, BHC still had not paid Ayd the wages he was claiming under the

employment contract; therefore, the jury's verdict on the breach of employment contract claim necessarily constituted a factual determination that BHC had failed to promptly pay Ayd in accordance with section 3–505. The amount of the breach of contract award after remittitur establishes the amount of wages that BHC failed to pay Ayd. On remand, the only issues for the jury to determine are whether BHC's failure to pay Ayd resulted from a bona fide dispute, and if so, whether Ayd should be awarded "an amount not exceeding 3 times the wage...." The role of the trial judge is limited to determining attorney's fees and costs. *See Admiral Mortgage*, 357 Md. at 553, 745 A.2d 1026. We shall now address the interesting question of the admissibility, both at the original trial and on limited remand, of one of the important pieces of evidence in this case.

## IV.

### Admission Of Photocopied Document

In its appeal, BHC asks us to hold that the trial court erred in admitting a photocopy of the Informal Board Action that established Ayd's annual salary at $30,000 as part of a composite exhibit consisting of the personal files of the corporate secretary (Ayd's sister), after excluding that same document on best evidence grounds when it was offered individually. In his cross-appeal, Ayd asks us to hold, "should this matter be remanded for further proceedings," that the photocopy is admissible notwithstanding the best evidence rule.

The reason for the heated dispute over admissibility of the Informal Action of the Board of Directors is clear. The copy of the document introduced into evidence includes the following clause:

RESOLVED: That [Ayd] is hereby employed by BHC to perform management, consulting, and such other services as the Board of Directors may direct, and to serve as President of BHC, in consideration of the sum of $576.92 per week, payable weekly until terminated by him or [BHC] on ninety (90) days notice.

The document was dated February 25, 1994, and bears the signatures of Robert M. Berman, Rita O'Brennan, and Ayd.

Before trial, BHC made an oral motion in limine. BHC argued that the document was not authentic, and that there was no original. Citing the best evidence rule, BHC asserted that the court first must determine as a matter of law whether the duplicate was authentic, and if the court determined it was authentic, then the parties were required to argue their contentions to the jury. The court stated that based on the facts at that time, it would allow the document "to be introduced." The court, however, signaled a possible change in its ruling, explaining, "Clearly if the proper foundation is not laid at [trial], the [c]ourt will revisit that decision."

During questioning of O'Brennan at trial, Ayd attempted to introduce the document. BHC's counsel objected, asserting that the document was fabricated. He stated that Berman never signed the document and that the type style or font was different from the other documents signed on the same day. The court allowed the document to be identified for the record, but not to be admitted into evidence. At the end of trial that day, the court requested that, even though it had already allowed testimony pertaining to the document, it wanted both sides to research the best evidence rule and argue why or why not the document should be submitted to the jury.

The following day, Ayd stated that he could not prove what happened to the original document. Ayd later attempted to authenticate the document, stating that he remembered signing the document. At the end of Ayd's case, he moved to admit the document into evidence. The court denied admission of the document, holding that Ayd "did not establish that the original was lost or the reasons why it was lost and therefore the photocopy ... [was] not admitted into evidence."

That ruling did not end the story, however, because Ayd later moved another photocopy of the same document into evidence as a part of corporate documentation kept by O'Brennan, who was Ayd's sister and served as corporate secretary.

The second copy was admitted as part of the composite exhibit, without any objection by BHC's counsel. Once he realized that the document had been admitted into evidence, however, BHC's counsel objected to the composite exhibit being submitted to the jury. The trial judge stated that at the time the O'Brennan compilation was introduced, she "was surprised that there was not an objection," but held that BHC's objection came "too late." The jury was permitted to consider the document, along with Berman's testimony that he had not seen the document before and that the signature on it was not his. The jury's verdict in favor of Ayd on the breach of contract count, and its damage award on that count, require us to infer that the jury found the document to be authentic, and predicated its award of contract damages on the weekly salary figure in the document.

The simple answer to BHC's argument is that whatever advantages the best evidence rule might have afforded BHC in the first trial were waived by its failure to object to the composite exhibit. *See, e.g., State Roads Comm'n v. Bare,* 220 Md. 91, 94–95, 151 A.2d 154 (1959) (objection to testimony waived "by permitting subsequent testimony to the same effect to come in without objection"); Joseph F. Murphy, Jr., *Maryland Evidence Handbook, 3d ed.,* § 105(D), at 22 (1999)("[i]f the trial judge has sustained your objection to inadmissible evidence, but opposing counsel later tries to introduce this very same evidence, you must object to it once again. If you do not object each and every time the inadmissible evidence is offered, your ultimate failure to do so will be treated as a waiver by the appellate court").

What is less simple is whether BHC is entitled to a "second chance" to exclude the objectionable document and its contents at the new trial on Ayd's Wage Payment and Collection Law claim. With the exercise of greater vigilance, can BHC keep the document, and evidence regarding its content, away from the new jury who will determine whether to award Ayd up to three times the amount of the judgment on the breach of contract claim?

The best evidence rule (Rule 5–1003) states in pertinent part: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original...." Chief Judge Murphy has concisely summarized the rule, and its related policy, procedure, and burdens.

The best evidence rule as we apply it here is a rule of exclusion, not a permitted inference. If the contents of a writing are at issue, unless the original writing is produced, or unless its absence is satisfactorily explained, the trial judge must exclude any other evidence of content.

\* \* \* \*

What is a "genuine question" as to the authenticity of the original? When would it be "unfair" to admit the duplicate in lieu of the original? No cases have yet interpreted this section.... Under Md. Rule 5–1008(a), the judge decides whether the proponent of secondary evidence has fulfilled the conditions for admitting "evidence other than the original." ... When the original is in someone else's possession, you must make an effort to produce it in court.... If your opponent has the original, you may subpoena it or file a "notice to produce." ... [Y]ou are still required to make every reasonable effort to bring the original into court. Murphy, *supra,* § 1104(B) at 458–59; § 1104(B)(3) at 461.

The rule is intended to ensure that evidence submitted to the fact-finder meets a minimal level of reliability. "The rationale for the rule was that, when the terms or contents of a writing are of central importance to a case, special care must be taken that they be proved accurately. Requiring the production of the original was designed to avoid inaccuracies due to mistake, faulty memory, or fraud." 6 Lynn McLain, *Maryland Evidence,* § 1001.1, at 522–23 (1987).

Ayd argues that the document should not be excluded merely on the basis of the parties' dispute over its authenticity. Citing no authority, Ayd complains that "[u]nder the standard adopted by the trial [c]ourt, a[p]arty wishing to enter

a copy of a document will never be able to enter a disputed document if the other [p]arty raises the issue of authenticity." Ayd's fears are unjustified, because they arise from over-simplification of the analysis required under the best evidence rule.

 The best evidence rule is by no means insurmountable. Indeed, the very next rule, Rule 5–1004, spells out how to get a copy that is otherwise objectionable under the best evidence rule admitted into evidence. "When the best evidence rule requires the production of . . . an original . . . and [the original] is unavailable for some reason other than the culpable fault of the proponent, the contents of the writing . . . may be proved by other, secondary evidence." McLain, *supra*, § 1004.1, at 536. Under Rule 5–1004, there are three ways to prove the unavailability necessary to avoid the best evidence rule.

The contents of a writing . . . may be proved by evidence other than the original if:

(a) Original lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;

(b) Original not obtainable. No original can be obtained by any reasonably practicable, available judicial process or procedure;

(c) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing or trial, and that party does not produce the original at the hearing or trial. . . .

Thus, contrary to Ayd's suggestion, not "any and every" authenticity challenge will succeed. When read and applied together, the rules prevent such abuse. Under Rule 5–1003, the question of authenticity must be "genuine." Under Rule 5–1004, there are several "unavailability" exceptions relating to documents that have been sought in discovery or have been in an opponent's possession or control. Under Rule 5–1008(a),

the trial judge determines whether the party seeking admission has sufficiently established one of the "unavailability" exceptions to the rule.

Here, BHC's waiver of its best evidence objection precludes us from reaching the issue of whether the trial court erred in finding that the best evidence rule applied, or in determining that Ayd could not introduce the copy because he failed to prove that the original was unavailable. But we wish to emphasize that any evaluation of the trial court's evidentiary rulings in the first trial would not have provided either party with the victory they now seek. We cannot instruct the trial court how to rule on the admissibility of the Informal Action in the new trial on Ayd's Wage Payment and Collection Law claim. That decision must be based solely upon the evidence and arguments proffered in the new trial. That decision may be different than the one at the first trial. We explain.

The Court of Appeals has held that after an appellate court remands for a new trial on a specified damage issue, the new jury must base its decision solely on evidence submitted at the new trial, and the parties are not bound by previous evidentiary rulings on the previously offered evidence. In *Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 709 A.2d 1222 (1998), after vacating a punitive damages award, the Court declined to consider whether certain evidence erroneously had been permitted to be introduced at the first trial, explaining that "[a]t the new trial the parties are not limited to the evidence presented below, nor are they limited by previous evidentiary rulings." *Id.* at 655, 709 A.2d 1222. In *Bowden v. Caldor*, 350 Md. 4, 710 A.2d 267 (1998), the Court held that the amount of any damages awarded by the jury at the new trial "was totally dependent upon the evidence introduced at the new trial ... and upon the judgment of the jury at the new trial." *Id.* at 25, 710 A.2d 267. Similarly, in *Middle States Holding Co. v. Thomas*, 340 Md. 699, 668 A.2d 5 (1995), the Court held that "parties at a new trial on punitive damages are not limited to the same evidence produced at the prior trial" because "[t]he evidence produced at the new trial may turn out to be significantly different from the evidence that was introduced

at the earlier trial." *Id.* at 704, 668 A.2d 5. And in *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), the Court instructed that in a new trial on punitive damages, "[t]he parties, of course, are not limited to the same evidence produced at the original trial." *Id.* at 472, 601 A.2d 633.

Although these cases involved remands for new trials on punitive damages, we shall follow the same rule in remanding this case for a new trial on statutory damages under section 3–507.1. In *Bowden,* the Court stated that

> [w]hen an appellate court reverses *a judgment for compensatory damages, or punitive damages, or both,* and remands for a new trial without expressly limiting the scope of that new trial, the evidence at the new trial and the legal standards applied at the new trial determine whether there should be an award of damages and if so, the amount of that award.

*Id.* at 20, 710 A.2d 267. The statutory damages available under section 3–507.1 are both compensatory and punitive. *See Admiral Mortgage,* 357 Md. at 549, 745 A.2d 1026.

In this case, our limited remand for a new trial relates solely to the punitive component of those statutory damages. We have affirmed the judgment entered on the breach of employment contract claim. The amount of the judgment on the breach of contract claim represents the amount of wages that BHC failed to pay to Ayd in accordance with section 3–505. The remaining jury issues necessary to decide the Wage Payment and Collection Law claim are the factual determination of whether there was a "bona fide dispute" and the discretionary determination of whether to award Ayd damages over and above the actual wages awarded for breach of contract.

We decline to rule on the admissibility of the Informal Action in the remanded proceedings. That would require us to speculate on whether Ayd will seek to introduce a photocopy of the Informal Action, whether BHC will make a timely objection, whether Ayd will proffer evidence of unavailability, and, if so, whether the trial judge will determine that Ayd has

laid an adequate factual foundation to establish unavailability. *See* Md. Rules 5–1004, 5–1008(a). We shall neither anticipate the course of those proceedings nor usurp the trial court's role in them.

JUDGMENT AFFIRMED AS TO BREACH OF CONTRACT AND UNJUST ENRICHMENT COUNTS; JUDGMENT REVERSED AS TO MARYLAND WAGE PAYMENT AND COLLECTION LAW CLAIM, AND REMANDED WITH INSTRUCTIONS TO CONDUCT A NEW TRIAL IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLANT.