Yolanda Michiel **GLUNT**, Plaintiff,

v.

**GES EXPOSITION SERVICES, INC., et al., Defendants.**

No. AW–99–3013.

United States District Court,
D. Maryland,
Southern Division.

Dec. 11, 2000.

Omar V. Melehy, Melehy & Melehy, Silver Spring, MD, for plaintiff.

Vincent John Colatriano, Cooper, Carvin & Rosenthal, Washington, DC, David H. Thompson, Rachel L. Brand, Washington, DC, for defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court is Defendants' joint motion for summary judgment and Defendant Viad's separate motion for summary judgment as to all counts of Plaintiff's claims. This case arises from a series of events resulting in the demotion and resignation of Plaintiff, Yolanda Glunt, from her employment at

GES Exposition Services ("GES"). Plaintiff alleges that certain adverse actions were taken against her by her supervisors at GES based upon her pregnancy and her intent to take maternity leave. According to Plaintiff, this conduct amounted to pregnancy harassment and discrimination in violation of Title VII and the Family and Medical Leave Act. Additionally, Plaintiff contends that Defendants engaged in a pattern of paying her less than male employees performing substantially similar work and duties in violation of the Equal Pay Act, Title VII, the Maryland Equal Pay for Equal Work Act, and the Maryland Wage and Payment and Collection Law. The Defendants' joint motion has been fully briefed by all parties. Plaintiff failed to respond to Defendant Viad's separate motion for summary judgment. The Court held a hearing on the pending motions on December 1, 2000. Upon consideration of the arguments made in support of, and opposition to, the respective motions, the Court makes the following determinations.

## I. FACTUAL BACKGROUND

GES is a corporation that assists trade associations and other organizations in producing and managing events, such as trade shows. According to the corporate hierarchy of GES, Account Executives hold primary responsibility for overseeing all facets of client events. Formal job duties include managing the show's budget, supervising all employees assigned to the event, facilitating communications among the parties involved, and rectifying any errors or oversights committed by other employees working on the show. For particularly large events, multiple Account Executives could be assigned to one event where one would be designated as the lead Account Executive. The Account Executive position had a salary range of $38,800 – $62,200.

Project Coordinators, now known as Account Coordinators, perform many of the same tasks that Account Executives perform. However, Project Coordinators are subordinate to Account Executives. Additionally, Project Coordinators are not officially responsible for the ultimate success of the promoted event. Project Coordinators are commonly named as Account Executives for particular shows. The salary for Project Coordinators ranged from $22,640 – $33,960.

In 1990, Plaintiff was hired by Andrews Bartlett, a company that offered exposition services. Andrews Barlett was soon thereafter acquired by GES. Following the acquisition, Plaintiff continued her prior work as a customer service representative for five years eventually rising to the position of Senior Customer Service Representative. Over the years, she received favorable performance evaluations leading to merit raises in 1992, 1993, 1994 and 1995.

In June of 1995, Plaintiff was promoted from her position as Senior Customer Service Representative to Project Coordinator. Her starting salary as Project Coordinator was $27,255. It is undisputed that Plaintiff's performance as Project Coordinator was outstanding and that she received favorable performance appraisals from her supervisors. A year later, she received another merit increase raising her salary to $28,346. By September 1996, Plaintiff's salary was raised to $30,046 based upon a favorable recommendation by her supervisor, Diana Simmons. The recommending memorandum stated that "[s]ince [Plaintiff] has taken on the role of Project Coordinator, she has gone way beyond the roles and responsibilities of the position." (Pl.'s Opp'n to Def.'s Mot. Summ.J., Interoffice Memorandum, Ex. B.) The memo noted that, in her two-year tenure as Project Coordinator, Plaintiff not only assisted senior Account Executives on major shows, but also assumed the role of Account Executive on several events. The memo also noted that Plaintiff turned down a job offer from a competitor to remain with GES. In addition to her formal responsibilities as Project Coordinator, Plaintiff performed additional tasks

that included preparing a monthly show schedule assigning Project Coordinators and Account Executives to particular shows, overseeing customer relations during shows as "GES Ambassador," planning monthly staff meetings, training convention employees, and managing supplies as "Deputy Supply Manager." In 1997, she received yet another merit increase raising her salary as Project Coordinator to $31,349. Although supervisors suggested that she seek the position of Account Executive, Plaintiff declined because the salary initially offered to her as an Account Executive was below her earnings as a Project Coordinator when taking overtime pay into account.

Later in 1997, Plaintiff was assigned to the IMAGES project. The IMAGES project was a software development initiative that was intended to increase the efficiency of trade show productions. Her duties on the project included documenting business processes, designing and developing information systems and a training manual, facilitating communications with software developers, and managing other employees' time and other project-related tasks. Plaintiff played a highly important role on the project to the extent that she became an "expert." As a result, her responsibilities to the IMAGES project consumed a significant amount of her time.

After eight years of service, in February 1998, GES offered Plaintiff promotion to Account Executive. The offer included an annual salary of $42,000 with an auto allowance of $350.00 per month. Plaintiff accepted this position because she was erroneously informed that Project Coordinators would no longer be eligible for overtime pay. After her promotion, Plaintiff continued to work on the IMAGES Project in addition to assuming the duties of an Account Executive. In June 1998, Plaintiff informed two of her supervisors, Sue Harvey and Diana Simmons, of her pregnancy.

After learning of Plaintiff's pregnancy, Harvey asked Plaintiff on several occasions to lift up her shirt so that Harvey could see her stomach. After complying with Harvey's request twice, Plaintiff objected upon the third request. Harvey relented and did not make any further requests for Plaintiff to expose her stomach. Harvey also remarked that Plaintiff "waddled." Diana Simmons questioned whether Plaintiff was pregnant because she was not showing, but later called her "fat." Harvey failed to invite Plaintiff to an Account Executive meeting while the other Account Executives were extended an invitation. During a show, Harvey told Plaintiff that she could not go onto the show floor because she was pregnant and limited her duties to preparing for the show.

In July 1998, GES hired Keith Roe to supervise the national implementation of the IMAGES program. After Roe took over the IMAGES project, Plaintiff began to feel as if she was being shut out of the project. She was not included in meetings among IMAGES project team managers. Prior to Roe's coming, Plaintiff had been included in all manager meetings. In early September, Plaintiff notified Harvey that she was scheduled to give birth in January and planned to take maternity leave. Later that month, Roe stripped Plaintiff of responsibility for development of the training manuals. Roe stated to Donald James, Plaintiff's supervisor on the IMAGES project, that it would not be appropriate for Plaintiff to travel during the national roll-out because she was pregnant. Plaintiff's doctor had informed her that, although some pregnant women could travel up to their eighth month of pregnancy, she could still travel at her discretion.

According to Defendants, several errors in Plaintiff's performance as Account Executive on two shows resulted in her demotion. In 1998, Plaintiff was assigned as an Account Executive to the Software Development show. The Software Development show was one of the first shows testing the IMAGES Project. Plaintiff was assigned as the lead Account Executive with assis-

tance from Juan Vicioso, a male Account Executive. In the show's production, several signs were incorrectly sized or placed. Other errors occurred in the ordering of supplies and in the set design. Plaintiff complained that, at times, she would delegate certain tasks to Juan Vicioso that were performed inadequately. Nevertheless, Sue Harvey stated that Plaintiff bore the ultimate responsibility for the errors that occurred.

In 1998, Plaintiff was assigned as Account Executive for the Association of United States Army (AUSA). Juan Vicioso was also assigned as Account Executive. Because the AUSA event was one of the larger shows produced by GES, A.J. Jansko, the National Account Executive, participate in the event's preparation. Initially, Sue Harvey assigned Juan Vicioso to assist Mr. Jansko. Approximately six weeks into the production of the show, Plaintiff replaced him as the lead Account Executive. During the show, Plaintiff witnessed three members of the Production Department arguing as to the placement of an order for sand bags. In order to end the argument, Plaintiff volunteered to order the sand bags. Plaintiff forgot to order the sand bags resulting in the need for emergency replacements. Yet, due to a set construction change, the sand bags were not used in the show. Although the Production Department was usually responsible for placing such orders, Sue Harvey pinpointed ultimate responsibility for the oversight on Plaintiff. Another problem with the AUSA show involved incorrectly produced signs. Although Plaintiff shared the responsibility of developing the signs with Juan Vicioso, Defendant blamed Plaintiff alone for the problems with the signs. Due to her duties as Account Executive, Plaintiff worked several weekends from September to October in order to produce the two trade shows. One Saturday, Harvey called Plaintiff to see if she could work on the AUSA show that day. Plaintiff explained that she could not work on the AUSA show because she was hosting the bridal shower of a friend and planned an evening with her husband. The next day on Sunday after receiving a call from Harvey at breakfast, Plaintiff reported to work after finishing her breakfast and left that evening to walk her dog.

On December 1, 1998, Sue Harvey demoted Plaintiff to the position of Account Coordinator, previously called Project Coordinator, and reduced Plaintiff's salary to $34,945. The letter stated that Plaintiff's demotion was due to her lack of professionalism, commitment, and leadership. Plaintiff was scheduled to begin maternity leave on January 4, 1999, approximately one month after her demotion. After her demotion, Plaintiff wrote a complaint letter to Thomas Acker, a GES Human Resources officer. Plaintiff mistakenly faxed the letter to the GES Chicago Office when Mr. Acker was based in the Grand Rapid, MI Office. Apparently, the GES Chicago office did not forward the complaint letter to Mr. Acker. On December 15, 1998, Plaintiff took two weeks of vacation leave. She gave birth on January 3, 1999 and took three months maternity leave under the demoted pay scale. She resigned immediately upon her return to work in March. Thereafter, Plaintiff secured employment with a competitor of GES in a specially contrived position as Project Coordinator/Account Coordinator. Within three months, she rose to the position of Account Manager, the equivalent of an Account Coordinator at GES.

## II. DISCUSSION

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Haavistola v. Community Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 214 (4th Cir.1993); *Etefia v.*

*East Baltimore Comm. Corp.*, 2 F.Supp.2d 751, 756 (D.Md.1998). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1). The court must "draw all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citations omitted). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330–31 (4th Cir.1998); *Beale v. Hardy*, 769 F.2d 213. 214 (4th Cir.1985). In responding to a proper motion for summary judgment, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him or her. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2729.1 (3d.1998). The non-movant must show that she has access to admissible evidence for presentation at trial. *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548. In the absence of contradictory evidence showing a genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). For the purposes of summary judgment, a genuine dispute exists if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the non-moving party must

do more than merely raise some doubt as to the existence of a fact, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "In Title VII cases, courts should be wary of summary judgment motions because a party's intent is often the crucial element in such cases." *Johnson v. Runyon*, 928 F.Supp. 575, 579 (D.Md.1996). Accordingly, viewing the facts and evidence in the light most favorable to Plaintiff, the Court will address each of Plaintiff's claims below.

### B. *Equal Pay Act (EPA)*

Plaintiff posits to two premises for assigning liability to Defendants under the EPA. First, Plaintiff argues that, in her capacity as Project Coordinator, she performed essentially the same job functions as three male Account Executives for less pay. Second, Plaintiff alleges that, even after her promotion to Account Executive, Defendants failed to raise her salary to a level parallel to the starting salaries of the three male Account Executives. Defendants maintain that Plaintiff's duties as Project Coordinator and Account Executive were not substantially equally to the cited male counterparts. Defendants urge this Court to accept that Plaintiff's detailing to the IMAGES project and assumption of additional duties made her position so "unique" as to be beyond comparison to any other Account Executive.

■ The Equal Pay Act of 1963, 29 U.S.C. § 206(d) prohibits sex discrimination by employers "in the form of unequal pay for equal work." Lex Larson, *Employment Discrimination* § 107.01 (2d. ed.2000). To establish a claim under the Equal Pay Act (EPA), the plaintiff-employee must show that members of the opposite sex employed in the same establishment are paid different wages for equal work on the basis of sex. *See* 29 U.S.C. § 206(d)(1); *Corning Glass Works v.*

*Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). There is no dispute that several male Account Executives were paid more than Plaintiff in her position as Project Coordinator and Account Executive. Furthermore, as Plaintiff confines her claim to the Mid–Atlantic facility, there is no material dispute on the issue of similar working conditions. Thus, Plaintiff's *prima facie* case rests on whether the Plaintiff and these male Account Executives performed equal work.

### 1. *Substantially Equal*

■ In the Fourth Circuit, equal work does not require the positions to be identical in every respect. *See Soble v. University of Maryland,* 778 F.2d 164, 167 (4th Cir.1985); *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282, 285 (4th Cir.1974). Rather, Plaintiff must show that she and her male counterpart performed substantially equal work in terms of "skill, effort, and responsibility." *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490, 493 (4th Cir.1972). The actual work performed rather than titles controls that determination of whether employees performed substantially equal work. *Prince William Hosp. Corp.,* 503 F.2d at 285.

Typically, additional duties required of the higher paid male-dominated position are used to differentiate their jobs from the lower paid female-dominated position. *Clymore v. Far–Mar–Co., Inc.* 709 F.2d 499 (8th Cir.1983) (finding that plaintiff was not entitled to the same pay as one of her male predecessors who, unlike her, spent considerable time developing and implementing a new computer system). *Brennan v. South Davis Community Hosp.,* 538 F.2d 859, 862 (10th Cir.1976) ("(J)obs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value

commensurate with the pay differential."); *Prince William Hospital Corp.,* 503 F.2d at 285 ("One of the most common grounds for justifying different wages is the assertion that male employees perform extra tasks. These may support a wage differential if they create significant variations in skill, effort, and responsibility between otherwise equal jobs"); *Hodgson v. Brookhaven General Hospital,* 436 F.2d 719 (5th Cir.1970) (holding that extra duties assigned to the higher paid workers will not destroy the substantial equality of two jobs unless the extra duties (1) actually require extra effort (or skill or responsibility), (2) take a significant amount of the time of all of the higher paid workers, and (3) have an economic value to the employer commensurate with the pay difference). By contrast, Defendants apparently argue that Plaintiff's assumption of extra duties made her position "unique" and, thus, subject to a lower wage than her male co-workers who did not assume such duties.

■ Given the purposes of the EPA, "an employer cannot avoid the [EPA] by the simple expedient of loading extra duties onto its female employees—unless it pays them more." *Riordan v. Kempiners,* 831 F.2d 690, 699 (7th Cir.1987). Rather, in assessing the effect of additional duties on the substantial equivalent analysis, the Fourth Circuit has stated

> The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different.

*Brewster v. Barnes,* 788 F.2d 985, 991 (4th Cir.1986). While some courts have found that "an important differentiating task that accounts for a substantial amount of time on the job is sufficient to vitiate an assertion of equality," such a finding was predicated upon the permanent incidents of the two jobs in question. *See Equal Employment Opportunity Commission v. Ke-*

*nosha Unified School Dist. No. 1,* 620 F.2d 1220, 1225 (7th Cir.1980). For instance, in *Kenosha Unified School Dist. No. 1,* the predominately male custodians were paid more than the female-dominated cleaners given that 21%–35% of the custodian's time was spent on extra duties. 620 F.2d at 1226.

■ Here, Defendants place heavy emphasis on Plaintiff's responsibilities under the IMAGES project as making her position incomparable to any other Project Coordinator or Account Executive. Yet, it is undisputed that Plaintiff's assignment to the IMAGES project was temporary in nature. Defendants do not advance that participation in the IMAGES project was intended to be a permanent incident to Plaintiff's position as Account Executive or Project Coordinator. Instead, Defendants rely on work performed in an eight-month interval to characterize the duties performed by Plaintiff over three years. Furthermore, Defendants highlight Plaintiff's time spent on the IMAGES project and additional duties only until March 1998. Plaintiff's promotion to Account Executive did not become effective until March 1, 1998. Devoting a significant time to alternative duties that are temporary in nature for only one month does not, as a matter of law, preclude Plaintiff's position from being substantially similar to other Account Executives.

Equally important, the record indicates Plaintiff, in her capacity as Account Executive, was still assigned to at least eight shows. (*See* App. to Def.Mot.Summ.J. Vol. 4 Ex. CC 1998 Show Schedule). The two shows where she performed as "lead" Account Executive were large shows sponsored by highly important clients. John Kluh, one of the most experienced and higher paid Account Executives, produced thirteen (13) shows. Such numbers could reasonably indicate that Plaintiff was still responsible for the core common tasks of an Account Executive—producing and supervising trade show events. Furthermore, the testimony of her supervisor, Sue Harvey, indicates that she expected Plaintiff to produce the same level of performance and assigned her the same level of responsibilities expected of Account Executives that did not undertake extra duties. Plaintiff's claim is buttressed by the fact that, within several months of her promotion to Account Executive, Plaintiff was given supervisory authority over a male Account Executive, Juan Vicioso. These facts indicate that her permanent duties were intended to coincide with the traditional responsibilities of Account Executives.

Likewise, Plaintiff's participation in the IMAGES project and assumption of extra duties did not limit her central function as a Project Coordinator. The deposition testimony indicates that, despite her additional duties, Plaintiff was assigned to assist on larger shows than her contemporaries. Likewise, she assumed the role of Account Executive on twelve occasions and supervised larger shows. Even though the IMAGES project and other additional tasks may have consumed significant amounts of Plaintiff's time at different stages in development, Plaintiff still performed her duties as Project Coordinator in a sufficiently commendable fashion to warrant a promotion to Account Executive. In light of such evidence and the fact intensive inquiry necessary to assess the weight of Plaintiff's evidence that she performed substantially equal work to male Account Executives, one cannot say that, as a matter of law, Plaintiff cannot establish her *prima facie* case for an EPA violation.

■ Defendants acknowledge that Project Coordinators perform much of the same work as Account Coordinators. However, Defendants maintain that Account Coordinators are paid more because they hold a higher degree of responsibility in ensuring the success of the show and have supervisory authority over Project Coordinators. Responsibility is concerned with the degree of accountability required in the performance of the job,

with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17. Higher supervisory responsibility is a well-recognized reason to make jobs not substantially equal for purposes of the EPA. Nevertheless, as stated earlier, actual performance, not official job descriptions, control the determination of whether a higher degree of responsibility and supervisory authority actually existed. In the actual production of events, the evidence indicates that the lines of authority and job responsibility between Project Coordinators and Account Coordinators were not always clear. *Cf. Morgado v. Birmingham–Jefferson*, 706 F.2d 1184, 1188 (11th Cir.1983) (affirming district court's finding of an EPA violation where evidence showed that "the original distinctions between positions [of the female employee and her male counterparts] had become less clear [and] certain staff positions had begun to resemble one another.").

It is undisputed that Account Coordinators supervised Project Coordinators in the production of some events. In other events, multiple Account Coordinators could be assigned to the same show. In such instances, the Account Executive junior to the "lead" Account Executive essentially performed the same functions as a Project Coordinator. Similar to Project Coordinators, such "junior" Account Executives would perform the regular functions of an Account Executive, but would not be ultimately responsible for the success of the show or hold the highest ranking position. For other shows where no official Account Executive was assigned, Project Coordinators assumed all the responsibilities of an Account Executive. Despite this apparent overlap in responsibilities and supervisory authority, even the highest paid Project Coordinator ($33,960) would be paid almost $5,000 less than the lowest paid Account Executive ($38,800).

Defendants posit that Project Coordinators held ultimate supervisor authority for smaller shows than those traditionally as-signed to Account Executives. As Project Coordinator, Plaintiff served as Account Executive for twelve (12) shows. When she served as Account Executive, she was responsible for larger and more complex shows than other Project Coordinators. These facts reasonably support Plaintiff's claim that *she* performed duties substantially similar to those of Account Executives. *Cf. Katz v. School Dist.*, 557 F.2d 153 (8th Cir.1977) (finding EPA violation even though a female employee's responsibilities were only equal to those of her male comparator because she performed work above and beyond her job description).

Likewise, as Project Coordinator, she supported Account Executives on large shows. For example, the depositions from GES employees show a general consensus that the AUSA show was one of the larger shows produced by GES. The record reveals that Plaintiff served as Project Coordinator for the AUSA shows for several years. For instance, when Susan Haning was an Account Executive on the 1997 AUSA show, Plaintiff assisted her as Project Coordinator. Yet, when Plaintiff was assigned as the "lead" Account Executive for the 1998 AUSA show, she was assisted by another Account Executive, Mr. Vicioso. There is no suggestion that the scope and complexity of the annual AUSA show changed from year to year. Nevertheless, in one year an Account Executive/Project Coordinator team was sufficient to produce the event. The next year, two Account Executives, with one serving as "lead," was sufficient to produce the same event. Yet, when Plaintiff served as Project Coordinator, she was paid $31,349. By contrast, Mr. Vicioso, as "junior" Account Executive was paid $48,000 for apparently the same work and level of responsibility. This apparent interchangeability between Project Coordinators and "junior" Account Executives could lead a reasonable jury to conclude that the two performed substantially similar work for unequal pay. *Cf. Brennan v. Prince William Hospital Corp.*, 503

F.2d 282, 287 (4th Cir.1974) (finding EPA violation where two positions, "[a]s hired, trained, and employed, [were] practical substitutes for one another in the performance of their basic duties."). Therefore, viewing the facts in the light most favorable to Plaintiff and weighing the evidence in her favor, Plaintiff has produced sufficient evidence to support a *prima facie* showing that the wage differential violated the EPA.

### 2. *Explanatory Factors Other than Sex*

■ "Once the [Plaintiff] satisfies her burden of establishing a prima facie case, the burden shifts to the employer to prove, by a preponderance of the evidence, that the pay differential is justified by one of the four statutory exemptions."[1] *Equal Employment Opportunity Commission v. Aetna Ins. Co.,* 616 F.2d 719, 724 (4th Cir.1980); *see also Usery v. Bd. of Education,* 462 F.Supp. 535 (D.Md.1978). Specific to the case at hand, Defendants must show that the wage differential was attributable to a factor other than sex. This burden requires the employer to establish a gender-neutral reason as to why Plaintiff's salary was not the same as that of a male with substantially equal responsibilities. *Grove v. Frostburg Nat'l Bank,* 549 F.Supp. 922 (D.Md.1982). Plaintiff's complaint points to three male Account Executives to support her EPA claim, Criston Ellis, John Kluh, and Juan Vicioso.

### a. *Criston Ellis*

Defendants explain that Mr. Ellis received a higher starting salary because he was internally transferred from a higher-paying position. It is widely recognized that an employer may continue to pay a transferred or reassigned employee his or her previous higher wage without violating the EPA, even though the current work may not justify the higher wage. *See, e.g., Covington v. Southern Illinois University,*

816 F.2d 317 (7th Cir.1987); *Grove v. Frostburg Nat'l Bank,* 549 F.Supp. 922 (D.Md.1982); *but see Gosa v. Bryce Hosp.,* 780 F.2d 917 (11th Cir.1986) (finding EPA violation where female employee was paid as a lower laborer despite promotion to regularly higher paid position even though male comparators had been transferred from a previously hiring paying position). In March of 1997, Mr. Ellis received a pay raise setting his salary at $44,519.04 in his position as Customer Service Representative Manager. In December of 1997, Mr. Ellis was transferred to the Account Executive position with no change in his prior salary. Despite Plaintiff's criticisms as to the grounds for allowing such a wage transfer, Defendant has shown a valid reason other than sex for the wage differential between Plaintiff and Mr. Ellis. As Plaintiff fails to produce specific evidentiary facts indicating that Mr. Ellis's sex, as opposed to an alleged favorable relationship with a female supervisor, played a role in the employer's decision, the Court finds that Mr. Ellis's higher wage does not run afoul of the EPA.

### b. *John Kluh*

■ Defendants maintain that John Kluh's higher wage ($56,000) is attributable to his extensive prior experience and its need to draw him from a competitor. Offering a higher starting salary in order to induce a candidate to accept the employer's offer over competing offers has been recognized as a valid factor other than sex justifying a wage disparity. *Mazzella v. RCA Global Comm, Inc.,* 814 F.2d 653 (2d.Cir.1987); *Walter v. KFGO Radio,* 518 F.Supp. 1309 (D.N.D.1981). Prior salary may be one of several gender-neutral factors employed in setting the higher salary of a male coming in from the outside. *See Tornow v. University of North Carolina,* 977 F.2d 574, 1992 WL 237282 (4th Cir. 1992). Likewise, greater experience may

---

1. An employer may pay different wages for equal work where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1).

support an employer's decision to pay one employee more than another performing equivalent work without sex being a factor. *See Hutchins v. Teamsters,* 177 F.3d 1076 (8th Cir.1999); *Hein v. Oregon College of Educ.,* 718 F.2d 910 (9th Cir.1983); *but cf. Irby v. Bittick,* 44 F.3d 949 (11th Cir.1995) (finding that a higher prior salary in conjunction with extensive experience may justify a wage disparity if employer shows that it credited such experience consistently across gender lines).

The Court is aware of Plaintiff's objections concerning Defendants' compliance with discovery procedures. Plaintiff complains that Defendants' initial reason, as stated in its interrogatory responses, for paying Mr. Kluh a higher wage (that he was a Senior Account Executive) was determined to be false. Plaintiff objects to the newly advanced reason of market forces because Defendants failed to supplement their interrogatories and did not reveal the market forces rationale until the filing of its dispositive motion, two days before the completion of discovery. The Court agrees that compliance with discovery procedures is important to the full and fair resolution of an adversarial proceeding. Still, as Plaintiff elected not to file a motion in limine or a motion to extend discovery as to the new market forces defense, the Court does not find it necessary to exclude its consideration of this recently advanced reason. Furthermore, it remains undisputed that Mr. Kluh held twelve years of experience in the trade show industry when GES offered him employment. His prior salary was $70,000 at a competitor of GES. Furthermore, at the time GES was negotiating with Mr. Kluh, a competitor has extended him an offer that was only $2,000 less than the finally agreed starting salary. In the face of these undisputed facts, the Court believes that market forces, not sexual bias, led to Mr. Kluh's higher salary.

### c. *Juan Vicioso*

In July 1998, Juan Vicioso began working as an Account Executive at a starting salary of $48,000 with a $350 monthly car allowance. Defendants maintain that Juan Vicioso was offered a higher starting salary because of his experience as convention manager in the hotel industry, his certification as a certified meeting professional, and his bachelor of science degree in hotel/restaurant management. Courts have recognized additional formal education as a bona fide reason for paying different wages. *Dey v. Colt Construction,* 28 F.3d 1446 (7th Cir.1994); *Covington v. Southern Illinois University,* 816 F.2d 317 (7th Cir.1987). However, the affirmative defense is applicable only when the superior formal education is actually relevant and necessary to the job in question. *See Hodgson v. Brookhaven General Hospital,* 436 F.2d 719, 726 (5th Cir.1970). "The crucial question under the Equal Pay Act is not whether one sex possesses additional training or skill, but whether nature of the duty actually performed requires or utilizes those additional skills." *Peltier v. Fargo,* 533 F.2d 374 (8th Cir.1976); *see also Bullock v. Pizza Hut, Inc.* 429 F.Supp. 424 (M.D.La.1977) (finding EPA violation where female manager was paid less that another male manager, allegedly based on his greater formal education, when that education was not demonstrably job related, nor clearly of more economic value to the employer). At GES, certain pay disparities existed in the setting of Account Executives' salaries that could lead a reasonable jury to conclude that education was not a factor. Cari Foust and Shannon McFall, female Account Executives with college degrees, were paid less than Mr. Vicioso. By contrast, John Kluh and Diana Simmons who were paid more than Mr. Vicioso *did not* possess college degrees. Yet, Denise Morgan, a female Account Executive with a college degree, was paid $10,000 less than John Kluh and $2,000 less than Mr. Vicioso. Such inconsistencies in pay given to Account Executives irrespective of formal education achieved could reasonably support a jury's finding that GES is not entitled to an affirmative defense. *Accord Brinkley–*

*Obu v. Hughes Training, Inc.*, 36 F.3d 336, 353 (4th Cir.1994) ("Considering the inconsistencies in [the employer's] treatment of its employees and the evidence adduced at trials showing that less experienced people are often paid more highly than more experienced ..., it is not 'more likely than not' that experience can account for the disparities...."). As a genuine issue of material fact exists as to whether the level of formal education truly had bearing on the duties of an Account Executive, Defendants have not sustained their burden of showing that, as a matter of law, Juan Vicioso's education was the gender-neutral reason for paying him a higher wage than Plaintiff.

As to experience, in her capacity as Customer Service Representative and Project Coordinator, Plaintiff held eight years of relevant trade show experience at the time of her promotion to Account Executive. By contrast, Mr. Vicioso held about six years of experience in event promotions from the hotel industry perspective. Moreover, the record indicates that Plaintiff supervised Juan Vicioso. Such evidence undermines Defendants' assertion that Vicioso's higher salary was due to his greater experience. "[W]hen the plaintiff adduces sufficient evidence controverting an employer's assertion that higher salary is due to more experience, a genuine issue of material fact can arise." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 615 n. 12 (4th Cir.1999); *see Fowler v. Land Management Groupe, Inc.*, 978 F.2d 158 (4th Cir.1992); *Keziah v. W.M. Brown & Son, Inc.*, 888 F.2d 322 (4th Cir.1989). Although Plaintiff was paid $6,000 less than Mr. Vicioso, unless the employer has a reasoned, non-sex-based justification for even the smallest differences, the plain language of the EPA has been violated. *See Dey v. Colt Construction*, 28 F.3d 1446 (7th Cir.1994) ($7,000); *EEOC v. Hay Assocs.*, 545 F.Supp. 1064 (E.D.Pa.1982) ($10,000); *Wirtz v. Koller Craft Plastic Prods. Inc.*, 296 F.Supp. 1195 (E.D.Mo. 1968) (10–cent per hour). Accordingly, the Court shall deny Defendants's motion for summary judgment as to Plaintiff's EPA claim.

### 3. *Statute of Limitations*

Defendants argue that their potential liability under the EPA is limited to acts occurring after October 1, 1997 because of the two-year statute of limitations applicable to non-willful violations of the act. *See* 29 U.S.C. § 255(a). Plaintiff counters that the three-year statute of limitations for willful violations applies. A willful violation arises when the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [EPA] ...." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115, 122 (1988). "In general, issues of fact bearing on the application of a statute of limitations are submitted, as are other issues of fact, for determination by the jury." *Fowler v. Land Management Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir. 1992). Thus, the function of this Court is limited to determining whether Plaintiff has adduced sufficient evidence upon which a reasonable jury could find in her favor. Here, Plaintiff has produced payroll records from GES employees evidencing a pattern of pay disparities between male and female employees in seemingly similar positions. There is also evidence that Plaintiff's supervisors knew that she was performing work "above and beyond" that of a Project Coordinator while not offering a salary commiserate with that performance. As discussed above, Defendants paid Plaintiff less than a male Account Executive subordinate to her. A reasonable jury could find a willful violation in the face of such evidence. Accordingly, summary judgment as to the extent of Defendants' liability for a willful violation is not warranted at this juncture.

### C. *Maryland Equal Work for Equal Pay Act (MEPA)*

The MEPA essentially mirrors its federal counterpart, the EPA. The primary dif-

ference lies in that the MEPA requires equal pay for work of "comparable character," while the EPA requires equal pay for substantially similar work.[2] Despite this difference, courts have applied the same analysis in reviewing MEPA and EPA claims. *See Nixon v. State,* 96 Md.App. 485, 492–95, 625 A.2d 404 (1993); *Hassman v. Valley Motors, Inc.,* 790 F.Supp. 564 (D.Md.1992). Consequently, the previously discussed EPA analysis applies to Plaintiff's MEPA claim. With respect to the statute of limitations, an action arising under the MEPA is subject to a three-year limitations period. Md.Code Ann., Labor & Emp., § 3–307(c). Thus, there is no dispute that Plaintiff's MEPA claim was filed in a timely fashion. Therefore, for the reasons discussed above, the Court shall deny Defendant's motion for summary judgment on the MEPA claim.

### D. *Title VII*

■■■ Title VII of the Civil Rights Act of 1964 provides that an employer shall not "fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Gender-based employment discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, encompasses dis-

crimination on the basis of pregnancy. 42 U.S.C. § 2000e(k).[3]

### 1. *Wage Discrimination*

■■■ While the Equal Pay Act and Title VII are meant to remedy the evil of discriminatory pay based upon sex, the Equal Pay Act's prohibition of unequal pay for equal work is viewed as being narrower in scope than Title VII's mission to route out discrimination in compensation. *See Equal Employment Opportunity Commission v. Aetna Ins. Co.,* 616 F.2d 719, 724 n. 5 (4th Cir.1980). Under the disparate treatment model, "the plaintiff may establish a *prima facie* case by demonstrating that she is female, i.e., and that the job she occupied was similar to higher paying jobs occupied by males." *Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994). Once the plaintiff establishes her *prima facie* case, the burden shifts to the Defendant to advance a legitimate nondiscriminatory reason for the apparently discriminatory wage differential. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). In *Gunther,* the Supreme Court held that the Bennett Amendment incorporated the four affirmative defenses of the EPA into Title VII wage discrimination claims. *County of Washington v. Gunther,* 452 U.S. 161, 168, 101 S.Ct. 2242, 2247, 68 L.Ed.2d 751 (1981). Therefore, the defendant may advance these affirmative defenses as legitimate nondiscriminatory reasons for the

**2.** The Maryland Equal Pay Act provides, in part, that:

(a) ... An employer may not discriminate between employees in any occupation by paying a wage to employees of 1 sex at a rate less than the rate paid to employees of the opposite sex if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type.... (b) ... this section does not prohibit a variation in a wage that is based on: (1) a seniority system that does not discriminate on the basis of sex; (2) a merit increase system that does not discriminate on the basis of sex; (3) jobs that require different abilities or skills: (4)

jobs that require the regular performance of different duties or services; or (5) work that is performed on different shifts or at different times of day. Md.Code Ann., Lab. & Emp. § 3–304(a) and (b) (1998).

**3.** "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-oriented purposes, including receipt of benefits ... as other persons not so affected but similar in their ability or inability to work...." 42 U.S.C. § 2000e(k).

pay differential. Consequently, Plaintiff may establish her case for wage discrimination under Title VII by meeting her *prima facie* burden under the EPA and discrediting her employer's proffered explanations for the pay differential. *See Brinkley–Obu*, 36 F.3d at 353. As discussed above, Plaintiff has produced sufficient evidence to create a factual dispute on the issue of substantial equivalence of work. Her assumption of additional duties did not, as a matter of law, detract from her performance of the core common tasks of an Account Executive or a Project Coordinator. Likewise, the similarity of duties and the level of responsibility given to Plaintiff as a Project Coordinator provides sufficient evidence of substantial equality to support a verdict in favor of Plaintiff. Furthermore, Plaintiff raises a genuine dispute as to Defendants' entitlement to an affirmative defense on the pay differential between herself and Juan Vicioso. However, Plaintiff has not produced sufficient evidence to create a genuine dispute as to the availability of the affirmative defenses explaining the higher wages for John Kluh and Criston Ellis. Accordingly, based upon the wage differential between Plaintiff and Juan Vicioso, the Court shall deny Defendants' motion for summary judgment as to Plaintiff's claim for wage discrimination under Title VII.

### 2. *Pregnancy Harassment*

 Defendants argue that the incidents suffered by Plaintiff are not actionable forms of sexual harassment. Title VII's protections against employment discrimination extend to the right to work in an environment free from sexual harassment. *See Garber v. Saxon Business Products*, 552 F.2d 1032 (4th Cir.1977). To prove a hostile environment work claim under Title VII, a Plaintiff must show (1) that the harassment was unwelcome, (2) that she was harassed because of her sex, (3) that the harassment was sufficiently severe and pervasive to alter the conditions of employment, and (4) that some basis exists for imputing liability upon her employer. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir.2000); *Swentek v. USAIR*, 830 F.2d 552, 557 (4th Cir.1987); *Katz v. Dole*, 709 F.2d 251 (4th Cir.1983). Plaintiff must have been subjected to workplace conditions that are viewed as "both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that [she] in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

 To support her pregnancy harassment claim, Plaintiff points to several acts by her supervisors, Sue Harvey and Diana Simmons. In one instance, Ms. Harvey observed Plaintiff drinking milk at a regional meeting attended by Sales Executives, Account Executives, and Project Coordinators. At the meeting, Harvey blurted out "What are you pregnant?" Plaintiff stated she was shocked and embarrassed by the statement and its amplification to all of the attendees. On several occasions, Harvey asked Plaintiff to lift up her shirt and expose her stomach. On one occasion, Harvey touched her stomach. Diana Simmons witnessed one of the occasions where Plaintiff lifted up her shirt in compliance and remarked "You're probably not even pregnant because you don't look pregnant." On another occasion, Harvey commented that Plaintiff's belly was "huge." After Plaintiff objected to lifting up her shirt, Harvey made no additional requests. Thereafter, Harvey had remarked that Plaintiff "waddled" and commented on "how big Plaintiff was getting."

While perhaps inappropriate and insulting, the complained of acts are not sufficiently severe and pervasive as to change the conditions of Plaintiff's employment. The Fourth Circuit has stated that "Title VII was not designed to create a federal remedy for all offensive language ... in the workplace." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.

1999) (quoting *Hopkins v. Baltimore Gas & Elec.*, 77 F.3d 745, 754 (4th Cir.1996)); *see also Harris v. Clyburn*, 47 F.3d 1164, 1995 WL 56634 (4th Cir.1995) (stating that, although occasional tickling was uncomfortable and embarrassing, such conduct was insufficient, as a matter of law, to create an abusive working environment); *Naylor v. City of Bowie*, 78 F.Supp.2d 469 (D.Md.1999) (finding supervisor's comment that he "wouldn't mind" getting "into [plaintiff's] pants" did not rise to the level of being sufficiently severe and pervasive as to create an objectively hostile work environment); *Boarman v. Sullivan*, 769 F.Supp. 904 (D.Md.1991) (hostile environment was not created by a supervisor's criticizing plaintiff's plan as stupid and asking her in a closed office to remove all of her clothing). While Plaintiff states that she was embarrassed and humiliated by her supervisors's statements and requests to expose her stomach, the approximately six incidents are not sufficiently pervasive and severe as to change the conditions of her employment. Therefore, Plaintiff's evidence cannot, as a matter of law, support her claim for pregnancy harassment under Title VII. Having established a material deficiency in Plaintiff's *prima facie* case for pregnancy harassment, Defendants are entitled to summary judgment on the pregnancy harassment claim.

### 3. *Pregnancy Discrimination*

Because Plaintiff's pregnancy discrimination claim falls within the ambit of Title VII, the Court applies the three-step burden shifting paradigm fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). "In a pregnancy discrimination case, the plaintiff thus bears the ultimate burden of establishing that the defendant discriminated against her 'because of' her pregnancy.'" *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir.1998). Under the *McDonnell Douglas* test, the plaintiff alleging discriminatory demotion traditionally establishes a *prima facie* case for intentional discrimination under Title VII by producing evidence that (1) she is a member of a protected class; (2) she was demoted; (3) she was performing the job satisfactorily, meeting her employer's legitimate expectations; and (4) the position remained open or ultimately was filled by a similarly qualified applicant outside of the protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999). If the plaintiff produces sufficient evidence to support her *prima facie* case, the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for the employee's demotion. *See Texas Dep't Community Affairs*, 450 U.S. at 254, 101 S.Ct. 1089. If the employer successfully proffers such an explanation, the burden returns to the plaintiff to show that the proffered reason is a pretext for impermissible discrimination. *See St. Mary's Honor Center*, 509 U.S. at 507–08, 113 S.Ct. 2742. Once the plaintiff had produced sufficient evidence to refute the defendant's proffered reason, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up discriminatory purpose." *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("[R]ejection of the defendant's proffered reasons will permit that trier of fact to infer the ultimate fact of intentional discrimination.").

■■■ There is no dispute that the plaintiff was a member of a protected class, i.e., she was pregnant during the period at issue. Furthermore, the December letter from Plaintiff's supervisor, Sue Harvey, establishes that Plaintiff was demoted from the position of Account Executive

with a corresponding decrease in salary. Defendants apparently argue that Plaintiff did not satisfactorily perform her job on two shows which resulted in her demotion.

### a. Legitimate Expectations

"[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage . . ., a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for [the adverse employment action.]" *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir.2000). For several years prior to announcing her pregnancy, Plaintiff had received outstanding reviews for her job performance as a Project Coordinator. In February 1998, Sue Harvey gave Plaintiff an appraisal rating her overall performance as "Outstanding." As discussed earlier, the deposition testimony from GES employees and Plaintiff's performance reviews indicate that Plaintiff had been performing functions similar to that of an Account Executive before her promotion in March 1998. Defendants assert no complaint as to the other six events assigned to Plaintiff following her promotion. In her deposition, Ms. Harvey testified that Plaintiff's alleged mishaps on the Software Development show did not lead to her decision to demote Plaintiff. Rather, her issues with respect to the AUSA show served as the basis for her demotion. To rebut Ms. Harvey's charges of poor performance as an Account Executive, Plaintiff has produced a letter from A.J. Janasko, the highest ranking GES employee on the event, commending her performance on the same AUSA show. Lastly, Defendants acknowledge that the ultimate success of the events is a primary indicator of an Account Executive's performance. Even Ms. Harvey, the supervisor responsible for Plaintiff's demotion, testified that the 1998 Software Development show went "well." According to Mr. Janasko's letter, the client stated that the 1998 AUSA show was the best show ever. Such indicators of overall satisfactory performance support Plaintiff's minimal burden of showing satisfactory performance for purposes of summary judgment.

### b. The Necessity of a Similarly Situated Replacement

As to the fourth element, "[i]n order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class." *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir.1998). Defendant argues that Plaintiff's claim must fail as a matter of law because she has failed to show that her former position as Account Executive was filled by a similarly qualified applicant outside of her protected class. Plaintiff argues that she may alternatively satisfy the fourth element of the *McDonnell Douglas* test by showing that her demotion occurred under circumstances giving rise to a reasonable inference of discrimination. Courts of Appeals from other circuits have applied such a standard to discriminatory discharge or demotion claims based upon sex, pregnancy, and race. *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1229 (10th Cir.2000) ("[T]he fourth prong of a plaintiff's prima facie test in a discharge case should be the same as for a failure to hire claim . . . . because comparison to a person outside of the protected class in the fourth prong of the prima facie case is unnecessary to create an inference of discriminatory discharge."); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir.1999) ("[N]othing in Title VII requires a gender-discrimination plaintiff to prove that he or she was replaced by someone outside the protected class . . . ."); *Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir.1998) ("[A] plaintiff may establish a *prima facie* case by demonstrating that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination."); *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir.1997) ("While the fact that one's replacement is of another national origin 'may help to

raise an inference of discrimination, it is neither a sufficient nor a necessary condition.' "). The above cases manifest an understanding that, "although the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged, the essential purpose served by a prima facie test remains the same." *Kendrick*, 220 F.3d at 1227.

As the Supreme Court has emphasized, "the proper solution . . . lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . .' " *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312–13, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (age discrimination) (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)). Likewise, in *Brown*, the Fourth Circuit recognized that the fourth element may be modified given the distinctive facts of a particular claim, "such as in age discrimination cases where a plaintiff within the protected class is replaced by another, but significantly younger, person within the same class, . . ., where there has been a significant lapse of time between the plaintiff's application and its eventual decision to hire another individual within the same protected class, . . . or where the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination toward the plaintiff." 159 F.3d at 905 (citations omitted). Similarly, in other instances of employment discrimination, the Fourth Circuit has recognized that the fourth element may be satisfied by a showing that the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir.1999) (applying standard to gender discrimination claim based upon failure to promote.) *cert. denied*, 528 U.S. 1189, 120 S.Ct. 1243,

146 L.Ed.2d 101 (2000); *Brown*, 159 F.3d at 902 (applying standard to gender discrimination claim alleging failure to hire); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir.1997) (age discrimination); *Dickens v. MCI Telecommunications Corp.*, 78 F.3d 578, 1996 WL 93810, at *3 (4th Cir.1996) (unpublished opinion) (stating fourth element for discriminatory demotion based upon race and age could be satisfied by "some other evidence that age or race was not treated neutrally"); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315 (4th Cir.1993), 12 F.3d 1310, 1315 (modifying the fourth element, "[i]n the context of a reduction-in-force, . . . where . . . the third and fourth elements . . . become meaningless."); *Alvarado v. Board of Trustees of Montgomery Community College*, 928 F.2d 118, 121 (4th Cir.1991) ("[T]he components of the test will vary with differing applications of Title VII.") Given the higher courts departure from a "rigid" application of the necessity of a similarly situated replacement where such a showing lacked probative value and evidence of discriminatory animus existed, the Court believes that Plaintiff may show that her demotion occurred under circumstances giving rise to a reasonable inference of discrimination to meet her *prima facie* burden under *McDonnell Douglas*.

Here, there is sufficient evidence to support a jury finding that Plaintiff was demoted under circumstances giving rise to a reasonable inference of unlawful discrimination. First, the Court believes that there is direct evidence of discriminatory animus against Plaintiff based upon her pregnancy. "Derogatory remarks may in some instances constitute direct evidence of discrimination." *Brinkley*, 180 F.3d at 608. Publicly, Ms. Harvey made derogatory pregnancy-based comments about Plaintiff, stating that she "waddled" and "was huge." She ordered Plaintiff to publicly expose her pregnant abdomen in the presence of her co-workers. Ms. Harvey informed Plaintiff that she did not want Plaintiff on the site of the AUSA show

because she was pregnant. Similarly, Mr. Rowe stated his intention to limit Plaintiff's travel responsibilities due to her pregnancy. Second, sudden hostility in a supervisor's behavior toward a pregnant employee upon learning of her condition may be sufficient to give rise to an inference of Discrimination. *See Bergstrom–Ek v. Best Oil*, 153 F.3d 851 (8th Cir.1998); *Crnokrak v. Evangelical Health Systems*, 819 F.Supp. 737 (N.D.Ill.1993). In *Bergstrom–Ek*, the plaintiff and her supervisor enjoyed an amicable relationship where the supervisor supported the plaintiff's promotion to management. 153 F.3d at 154. However, following the plaintiff's announcement of her pregnancy, the relationship rapidly deteriorated, culminating in the plaintiff's resignation three months later. *Id.* at 855–56. The supervisor called the plaintiff "stupid," urged her on several occasions to obtain an abortion, threatened to push her down a flight of stairs, and increased the plaintiff's physical workload. *Id.* at 854–55. The court found the supervisor's behavior change from "friendly and courteous to mean and hostile" in conjunction with the negative statements regarding the plaintiff's pregnancy in the presence of other employees supported a finding that the plaintiff was discharged under circumstances giving rise to an inference of discrimination. *Id.* at 858.

Here, Plaintiff has produced deposition testimony indicating that, before her pregnancy, Plaintiff and her supervisor had a very positive relationship. Before learning of Plaintiff's pregnancy, Ms. Harvey strongly recommended Plaintiff for her promotion to Account Executive. Yet, within a matter of months following the announcement of her pregnancy, Plaintiff went from "golden child" to an impediment that "compromised the success of [the] division." Several co-workers have testified that Ms. Harvey began to speak to Plaintiff in a noticeably condescending manner following the announcement of her pregnancy. One co-worker noted that Harvery "often seemed angry and cold toward the Plaintiff" and "hyper-critical of Plaintiff's job performance." (Pl. Opp'n. Ex. DD Beggan Decl. ¶ 19). The timing of Plaintiff's perceived decline in performance and the accompanying negative remarks relating to Plaintiff's pregnancy are sufficient to give rise to a reasonable inference of discrimination. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir.1998).

Moreover, Plaintiff satisfies the fourth element even under the existing precedent in this jurisdiction. In addition to showing replacement by a similarly qualified applicant outside of her class, the pregnancy discrimination plaintiff may finalize her *prima facie* case by showing that her former position remained open or that similarly situated employees were treated differently. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *DeJarnette*, 133 F.3d at 298. Plaintiff has produced sufficient evidence indicating that Account Executives outside of her class that experienced performance problems were not demoted to a lower-paying Project Coordinator (now Account Coordinator) position. According to Plaintiff's evidence, Juan Vicioso, a male Account Executive outside of Plaintiff's class, experienced performance problems which Defendants have not disputed. Although Juan Vicioso experienced performance problems on the AUSA show to warrant Plaintiff's replacement of him as the lead Account Executive, he was not demoted to a Project Coordinator rather he merely became junior to Plaintiff and maintained his position and salary. These apparent disparities in treatment support a reasonable inference that non-pregnant employees were treated more favorably than Plaintiff. Lastly, at the hearing, Defendant's counsel admitted that the Account Executive position remained open after Plaintiff's demotion.[4]

---

4. At the hearing, Defendant's counsel suggested that the failure to hire a replacement for Plaintiff was due to the financial constraints of GES in that it could not afford to hire a replacement. However, this excuse not only lends to a reduction in force argument, but

*See Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 122 (4th Cir.1991) (finding that contested position remaining open to similarly qualified applicants in the four months following the plaintiff's termination was sufficient evidence to satisfy the fourth element). Given that her demotion occurred under circumstances giving rise to a reasonable inference of unlawful discrimination, that other Account Executive experiencing performance problems were treated differently than Plaintiff, and that her position remained open after her demotion, Plaintiff has made the requisite *prima facie* showing under the *McDonnell Douglas* standard. Viewing the facts in the light most favorable to the Plaintiff and drawing all reasonable inferences in her favor, a reasonable jury could find that Plaintiff sustained her *prima facie* burden for pregnancy discrimination under Title VII.

### c. *Legitimate Nondiscriminatory Reason*

Now the burden shifts to GES to advance a legitimate nondiscriminatory reason for Plaintiff's demotion. GES alleges that Plaintiff committed numerous errors on two shows, the Software Development and AUSA shows, as the basis for her demotion. On the Software Development show, Defendants allege that Plaintiff improperly ordered and misplaced signs and props for the set design. Defendants maintain that these errors led to the client's dissatisfaction with the production of the event. On the AUSA show, Defendants maintain that Plaintiff forgot to place an order of sand bags; improperly ordered signs, and failed to work an appropriate amount of overtime. Plaintiff's poor job performance constitutes a legitimate, non discriminatory reason for demoting Plaintiff. *See Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278 (4th Cir.2000). Conse-

quently, to survive summary judgment, Plaintiff must produce evidence showing that the proffered reason is false or not credible.

### d. *Pretext*

■ Plaintiff has adduced sufficient evidence to support a reasonable inference that the proffered reasons were a mere pretext for discrimination. On the Software Development show, Ms. Harvey's own deposition testimony indicates that the client's complaints did not necessarily stem from Plaintiff's performance. In explaining why Miller–Freeman was not "happy" with GES's service, she stated

> they were not happy with the way we produced their event and the amount of time they had to take out of their duties at [the] show site ... their perception was the GES did not have enough labor to meet their needs....

(Def.Mot.Summ.J.App. O–90 Harvey Dep.). From this statement, it reasonably appears that the client complained that GES did not commit enough labor to meet their needs for the production of the Software Development show. As a consequence, there is a factual dispute as to whether GES's perceived failure to provide sufficient manpower rather than Plaintiff's performance that led to the client's dissatisfaction.

As to the AUSA show, the sand bags from the forgotten order cited by Defendant as a reason for demoting Plaintiff were never even used in the production. Furthermore, ordering the sandbags was not part of her duties. Rather, she assumed the additional responsibility in order to quell the dispute among the Production Department employees. Likewise, the record shows sufficient evidence to raise a question of fact as to whether the cited errors in the signs were actually commit-

---

also further supports the reasonable inference that Plaintiff was treated less favorably than other Account Executives. Only Plaintiff suffered a demotion and salary cut before the apparent "hiring freeze" on Account Execu-

tives while similarly situated Account Executives that were not pregnant with impending maternity leave did not suffer a similar adverse employment action.

ted by her. Evidence that errors attributed to the plaintiff were committed by another employee may cast doubt on the employer's proffered explanation for the adverse employment action. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2107, 147 L.Ed.2d 105 (2000). Sue Harvey told Plaintiff that Juan Vicioso was to be assigned as the lead Account Executive on the 1998 AUSA show because her supervisors did not want her at the show site due to her pregnancy. (Pl.Dep. at 805). Six weeks into the production of the 1998 AUSA show, Sue Harvey reassigned Plaintiff as the lead Account Executive, making Juan Vicioso the subordinate Account Executive. Plaintiff claims that, before her reassignment, Ms. Harvey erroneously ordered Juan Vicioso to place the sign orders which were determined to be unusable by the graphics department. Furthermore, Plaintiff's testimony indicates that she was held solely accountable for the mistakes in signs actually committed by Juan Vicioso, another Account Executive. While the remarks of Plaintiff's supervisors after learning of her pregnancy may not be sufficient to establish a hostile work environment, the derogatory comments regarding her pregnancy may be indicative of a discriminatory animus against Plaintiff based upon her condition. *See Brinkley*, 180 F.3d at 608; *Notter v. North Hand Protection, a Div. of Siebe, Inc.*, 89 F.3d 829, 1996 WL 342008, *7 (4th Cir.1996) (unpublished table decision) ("The employer's initial reaction upon learning of the employee's pregnancy can be circumstantial evidence of pretext and intent to discriminate.").

Equally important, while Defendant now claims that Plaintiff's conduct was sufficient to warrant a demotion. A.J. Jansko, the National Account Executive assigned to the AUSA show, wrote a letter to Plaintiff praising her performance on the show. In addition praising Plaintiff's performance, Mr. Jansko noted that the client had characterized the show as "the best Annual Meeting ever." Ms. Harvey testified that the alleged performance problems

of Plaintiff in the AUSA show led to her ultimate decision to demote Plaintiff. Given the subsequent commendations on Plaintiff's performance from the National Account Executive and the client and the questionable basis for Defendant's assertion that Plaintiff committed numerous errors, Plaintiff has produced sufficient evidence to create a genuine dispute as to whether her performance at the AUSA show was the reason for her demotion.

At this stage, the evidence shows competing testimony between Plaintiff and the supervisor accused of discriminating against her. "Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent," at the summary judgment stage, the court "grant[s][the] plaintiff the benefit of every favorable inference...." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir.1998) (quoting *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.1996)) (alterations in original). Here, a reasonable jury could find Ms. Harvey's account of events to be self-serving and false. On a motion for summary judgment, such determinations as to the weight of evidence and credibility of witnesses are to be resolved in favor of the nonmoving party. Therefore, Plaintiff has produced sufficient evidence to create a genuine issue of material fact and survive summary judgment.

### 4. *Punitive Damages*

■ Defendants argue that Plaintiff's request for punitive damages under Title VII is insufficient as a matter of law. A plaintiff "may recover punitive damages under [Title VII] ... if [she] demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). As discussed earlier, the payroll information produced by Plaintiff could support an inference that GES engaged in a pattern of paying female employees less than male employees

for comparable work. Similarly, a jury may reasonably infer malice or reckless indifference from Plaintiff's evidence that men were promoted more quickly to the higher paying Account Executive positions than women. *Accord Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir.1997). Furthermore, "a jury could ... infer[ ] malice or reckless indifference from the insensitive manner in which [the plaintiff] was [demoted]." *Notter v. North Hand Protection, a Div. of Siebe, Inc.*, 89 F.3d 829, 1996 WL 342008, at *11 (4th Cir.1996) (unpublished table decision). Here, Plaintiff was demoted two weeks before she commenced leave without the benefit of a performance evaluation warning her that her position was in jeopardy. Therefore, viewing the available evidence in the light most favorable to the non-movant, summary judgment is not warranted on Plaintiff's request for punitive damages.

### E. *Family and Medical Leave Act (FMLA)*

Plaintiff contends that her demotion before her scheduled maternity leave substantially reduced her paid leave, thereby, interfering with her exercise of the rights granted under the FMLA. The FMLA provides eligible employees [5] with certain rights that may not be interfered with or denied by a covered employer.[6] Specific to this case, the FMLA provides up to twelve (12) weeks of unpaid medical leave attributable to the employee's birth or adoption of a child. The FMLA prohibits employers from interfering with an employee's exercise of the rights granted under its provisions. 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.").

The crux of Plaintiff's FMLA claim is that Ms. Harvey demoted Plaintiff before

her FMLA leave in order to reduce her maternity leave benefits and circumvent the issue of reinstatement after Plaintiff's return. Defendants demoted Plaintiff one month *before* her scheduled maternity leave. GES's maternity leave policy provided six weeks of paid leave based upon 66% of the employee's salary. The demotion prospectively reduced her salary base for the six weeks of *paid* leave granted under GES's maternity leave policy. Defendants argue that the FMLA provides no entitlement to paid leave, only twelve weeks of *unpaid* leave. According to Defendants, in the absence of a substantive right to any paid leave, Plaintiff cannot claim that Defendants interfered with her FMLA rights through a prior demotion that reduced her maternity leave benefits granted under its own employment policy. There is no dispute that Plaintiff was entitled to take FMLA leave without interference from her employer. Furthermore, Plaintiff does not allege that Defendants deprived her of the entitlement to take twelve weeks of maternity leave.

■■■ Defendants correctly point out that the FMLA does not entitle eligible employees to paid leave. Nevertheless, its protections do not end there. The interpretive regulations of the FMLA state that " '[i]nterfering with' the exercise of an employee's rights ... includes ... not only refusing to authorize FMLA leave, but discouraging an employee from using such leave [and] manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b). "Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). Therefore, where an adverse employment action is influenced by the taking of family leave, the employer interferes with that

---

**5.** "Eligible employees" have been employed for more than twelve (12) months before requesting leave under FMLA and worked at least 1,250 hours within that period. 29 U.S.C. § 2611(2)(A).

**6.** A covered employer employs more than fifty (50) employees in a working day. 29 U.S.C. § 2611(4)(A).

employee's exercise of their rights under the FMLA. Under § 2615(a)(1), "to discriminate against an employee for exercising his rights under the [FMLA] would constitute an 'intererefer[ence] with' and a 'restrian[t]' of [her] exercise of those rights." *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir.1998).

■■■ While the Fourth Circuit has not explicitly fashioned a test for analyzing an employee's claims under the FMLA, the court has indicted that the analytical framework developed under Title VII cases should be applied. *See Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998). "Under that analysis, the plaintiff must show that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Cline,* 144 F.3d at 301; *see also Sharpe v. MCI Telecommunications Corp.,* 19 F.Supp.2d 483, 487 (E.D.N.C.1998). Likewise, in the absence of direct evidence of intent to interfere, the modern trend has applied the *McDonnell Douglas* burden-shifting test to create a presumption that the adverse employment action was prompted by the employee's exercise of her FMLA rights. *See Gleklen v. Democratic Congressional Campaign Comm., Inc.,* 199 F.3d 1365, 1367 (D.C.Cir.2000); *Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999); *Spades v. City of Walnut Ridge, Ark.,* 186 F.3d 897, 900 (8th Cir.1999); *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1284 (11th Cir.1999); *Hodgens,* 144 F.3d at 160. Other circuits have rejected application of the McDonnell Douglas standard where the employer denies its employees their substantive rights under the FMLA, such as entitlement to twelve weeks of leave or reinstatement after leave. *See Morgan v. Hilti,* 108 F.3d 1319, 1323 (10th Cir.1997); *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712–14 (7th Cir.1997). In those circumstances, the conduct itself violates the statute and the employer's motivation for the denial is im-

material. The employee needs only show entitlement under the statute and the employer's failure to allow for the prescribed entitlement. Here, Plaintiff is not alleging that GES denied her the right to take family leave. She claims that her expressed intention to take maternity leave played an impermissible role in the decision to demote her and that demotion reduced the employment benefits she would have received absent the discriminatory motive. Therefore, the *McDonnell Douglas* provides the proper framework for analyzing her claim.

■■■ To establish her *prima facie* case, Plaintiff must show that "(1) [s]he availed [her]self of a protected right under FMLA; (2)[s]he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens,* 144 F.3d at 161. There is no dispute as to the first two elements. First, of September, Plaintiff informed her supervisors of her intent to take twelve weeks of maternity leave for the birth of her child, a clearly protected right under the FMLA. *See* 29 U.S.C. 2612(a)(1)(A). Second, the demotion and accompanying reduction in salary evidence that Plaintiff suffered from an adverse employment action. As to the third element, Defendants argue that there is no causal nexus between Plaintiff's assertion of rights under the FMLA and her demotion. Temporal proximity between the employer's adverse employment action and the employee's exercise of her rights under the FMLA may reasonably support an inference that the action was taken in violation of the FMLA. *See Gleklen v. Democratic Congressional Campaign,* 199 F.3d at 1368; *King v. Preferred Technical Group,* 166 F.3d 887 (7th Cir. 1999); *Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999). In this case, Plaintiff was demoted approximately one month before she was scheduled to take maternity leave and two weeks before she took scheduled vacation

leave leading into her maternity leave. Such close proximity between the demotion and Plaintiff's exercise of her rights under the FMLA is sufficient to infer a causal connection between the two events. Further, after Plaintiff announced her intent to take twelve weeks of maternity leave, her supervisors began to strip her of certain duties and limit her participation on projects and events. Drawing all reasonable inferences in favor of Ms. Glunt, she has produced sufficient evidence to establish her *prima facie* case for purposes of summary judgment.

■ To rebut the plaintiff's *prima facie* case, the *McDonnell Douglas* framework requires the employer to advance a legitimate nondiscriminatory reason for the adverse employment action. *See* 450 U.S. at 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207; *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742, 125 L.Ed.2d 407. From its earlier argument, it can be gathered that Defendants maintain that Plaintiff's demotion stemmed from her poor job performance on two events. As stated earlier, poor job performance qualifies as a legitimate nondiscriminatory reason to demote an employee. The burden now shifts to Plaintiff to present evidence that the proffered reason is pretextual.

As discussed earlier, Plaintiff has produced sufficient evidence to create a genuine issue for trial as to whether her alleged poor job performance is just a pretext for discrimination. Considering the conflicting performance appraisals, her supervisor's sudden change in demeanor, the insulting comments of her supervisors regarding her pregnancy, and restrictions on her duties following the announcement of her pregnancy, a reasonable jury could render a verdict in Plaintiff's favor. *Cf. Hodgens*, 144 F.3d

at 167–68 ("[T]he patten of actions taken by [the] defendant precludes summary judgment concerning [the] defendant's motivation.") (quoting *Marx*, 76 F.3d at 329) (alterations in original).

### F. Maryland's Wage Payment and Collection Law (MWPCL)

■ Next, Defendants contend that Plaintiff's claim for treble damages under § 3–507.1 of the MWPCL cannot stand as matter of law. The civil enforcement remedy of the MWPCL states:

(a) In general.—Notwithstanding any remedy available under § 3–507 of this subtitle, if an employer fails to pay an employee in accordance with § 3–502 or § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

(b) Award and costs.—If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.[7]

Md.Code Ann., Labor & Emp. § 3–507.1 (1998). "Thus, employers risk liability for treble damages if they (1) fail to pay wages owed to a terminated employee within two weeks after the date he would been paid if his employment had continued, and (2) have no bona fide reason for withholding those wages." *Baltimore Harbor Charters, Ltd. v. Ayd*, 134 Md.App. 188 759 A.2d, 1091, 1100 (2000). Here, Plaintiff does not assert any violation of the

---

**7.** Section 3–502 states, in pertinent part, that "[e]ach employer: (i) shall set regular pay periods; and (ii) ... shall pay each employee at least once in every 2 weeks or twice in each month." Section 3–505 provides that "[e]ach employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md.Code Ann., Labor & Emp. §§ 3–502; 3–505 (1998).

MWPCL. Instead, Plaintiff argues the potential award of back wages stemming from a violation of the EPA, MEPA, or FMLA may serve as the basis for an award of treble damages under § 3–507.1 of the MWPCL. This argument contravenes the clear language of the statute which limits the application of treble damages to violations of the MWPCL. "When 'the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, ... courts will not look beyond the words of the statute itself to determine legislative intent.'" *Baltimore Harbor Charters, Ltd. v. Ayd*, 134 Md.App. 188, 759 A.2d 1091, 1101 (2000) (quoting *Board of License Comm'rs v. Toye*, 354 Md. 116, 122, 729 A.2d 407 (1999)). Consequently, there must be a violation of either § 3–502 or § 3–505 to sustain a private action under § 3–507.1. As Plaintiff has failed to allege or produce evidence of such violations, the Court shall grant Defendants' motion for summary judgment as to her claim brought under the MWPCL.

### G. Defendant Viad's Motion for Summary Judgment

■■■ In support of its motion for summary judgment, Defendant Viad maintains that it is not an "employer" of Plaintiff under Title VII, the Equal Pay Act, the FMLA, or any of the Maryland employment statutes. Viad argues that it is a party to this suit solely because of its status as parent to GES. According to Viad, the parent-subsidiary relationship alone is insufficient to impute liability for Plaintiff's claims of employment and wage discrimination. Plaintiff declined to respond to Viad's arguments concerning its status as her "employer" under the various statutes at issue

### 1. EPA

The EPA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. 203(d). In determining whether a particular entity falls with this statutory definition, courts have considered: "(1) the amount of control the alleged employer exerted on the employee; and (2) whether the alleged employer had the power to fire, hire, or modify the employment conditions of the employee." *Blalock v. Dale County Bd. of Educ.*, 33 F.Supp.2d 995, 999 (M.D.Ala.1998); *see also Welch v. Laney*, 57 F.3d 1004, 1010–11 (11th Cir.1995); *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir.1987). In the instant action, there is no evidence that Viad exerted any supervisory authority over Plaintiff in her employment at GES. In fact, Viad has produced affidavits stating that the parent has little involvement, if any, in the making of employment decisions affecting GES employees, such as Plaintiff. The evidence before the Court indicates such powers and control were confined to Plaintiff's supervisors at GES. In the absence of conflicting evidence, the Court finds that Viad is not Plaintiff's "employer" under the EPA.

### 2. MEPA

In addition to the EPA definition of employer, the MEPA defined an "employer" as "a person engaged in a business, industry, profession, trade, or other enterprise in the State." Md.Code Ann., Labor & Emp., § 3–301(b) (1998). Maryland courts have not yet interpreted this subsection of the MEPA. However, the treatment of foreign corporations for jurisdictional purposes is helpful in determining whether a defendant qualifies as a "person engaged in a business ... in the State" under the MEPA. For jurisdictional purposes, Maryland law does not consider a foreign corporation to be doing business within the state merely because of its subsidiary relationship to another corporation doing business in the state. *See Vitro Electronics, Division of Vitro Corp. of America v. Milgray Electronics, Inc.*, 255 Md. 498, 258 A.2d 749 (1969); *United Merchants & Mfrs., Inc. v. David*, 439 F.Supp. 1078 (D.Md.1977). Rather, there must be some conduct on the part of the parent that serves as the basis for extending Ma-

ryland's jurisdictional powers. *See Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56 (4th Cir.1993). Here, Plaintiff's complaint only states that Defendant Viad does business in the state of Maryland through its subsidiary, GES. There is no evidence that Viad exerts considerable control over the activities of GES, its local subsidiary. In fact, the only available evidence suggests that Viad and GES run their operations independent of each other with separate facilities, payrolls, and accounting procedures. As Plaintiff has not advance any evidence that *Viad* engaged in business within Maryland, the Court shall grant Defendant Viad's motion for summary judgment as to Plaintiff's MEPA claim as it is not her "employer" within the meaning of the MEPA.

### 3. *Title VII and FMLA*

In the absence of a direct employment relationship between the plaintiff and a defendant, courts have employed the "integrated employer test" to determine whether the defendant meets the statutory definitions of "employer" under Title VII and the FMLA *See Hukill v. Auto Care, Inc.,* 192 F.3d 437, 442 (4th Cir.1999) (assuming test's application to FMLA claim), *cert. denied,* —— U.S. ——, 120 S.Ct. 1978, 146 L.Ed.2d 806 (2000); *Thomas v. Bet Sound–Stage Restaurant/BrettCo, Inc.,* 61 F.Supp.2d 448 (D.Md.1999) (applying test to Title VII claim). Under the "integrated employer test," the court considers the existence of four factors between the parent and its subsidiary: (1) common management; (2) the interrelation between operations; (3) centralized control; and (4) the degree of common ownership and financial control. *See Hukill,* 192 F.3d at 442.

In applying the integrated enterprise test, courts have noted the following to be probative evidence that one company employs the other's employees for purposes of Title VII liability: (1) one company's employees hired and fired the other's employees and/or authorized lay offs, recalls, and promotions of such employees; (2) one company routinely transferred employees between it and the other company, used the same work force, and/or handled the other's payroll, (3) one company exercises more than general oversight of the other's operations by supervising the other's daily operations, such as production, distribution, purchasing, marketing, advertising, and accounts receivable, (4) the companies have common management in the form of interlocking boards of directors and/or common officers and managers, (5) the companies fail to observe basic formalities like keeping separate books and holding separate shareholder and board meetings, (6) the companies fail to maintain separate bank accounts, and (7) the companies file joint tax returns.

*Thomas,* 61 F.Supp.2d at 456 (citations omitted). After months of discovery, Plaintiff has not produced any of the above evidence to support imputing liability to GES's parent corporation, Viad. By contrast, Viad has produced evidence demonstrating that Viad plays no role in the daily operations of GES, including employment decisions affecting GES employees. Outside of stock options and other employee benefit plans, Viad and GES not only have segregated payrolls, books, and records, but also operate at separate locations. Essentially, Plaintiff has advanced no conflicting evidence in order to support an opposition to summary judgment. Plaintiff's complaint only identifies GES employees as the perpetrators of the alleged discriminatory actions. Furthermore, Plaintiff acknowledged that all of the complained of acts occurred at GES's Landover facility located in Prince George's County, Maryland. Plaintiff's complaint merely names Viad as a defendant to this action on the basis that Viad does business in this state through its subsidiary, GES. "[T]he 'integrated employer' test instructs a court to determine '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination.'" *Hukill,* 192 F.3d at 444

(quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983)). The factual allegations and evidence before the Court indicate that only GES exercised such authority in the employment decisions affecting Plaintiff. The mere fact of a parent-subsidiary relationship between co-defendants is not sufficient, as a matter of law, to impute liability to the parent for the alleged discriminatory actions of its subsidiary against that subsidiary's employees. In the absence of any evidence that Viad is the "employer" of Plaintiff, this Court does not have subject matter jurisdiction over Plaintiff's Title VII and FMLA claims against Viad. *See Hukill,* 192 F.3d at 441; *Woodard v. Virginia Bd. of Bar Examiners,* 598 F.2d 1345, 1346 (4th Cir.1979). Therefore, the Court shall grant Defendant Viad's separate motion for summary judgment.

## III. *CONCLUSION*

In summary, for the reasons stated above, the Court will deny-in-part Defendants' Motion for Summary Judgment as to Plaintiff's claims under the Equal Pay Act, the Maryland Equal Pay Act, Title VII based upon wage discrimination and pregnancy discrimination, and the Family and Medical Leave Act and grant-in-part Defendants' Motion for Summary Judgment as to Plaintiff's Title VII claim based upon pregnancy harassment and Plaintiff's claim for treble damages under § 3–507.1 of the Maryland Wage and Payment and Collection Law. The Court shall grant Defendant Viad's separate motion for summary judgment as the corporation is not Plaintiff's employer under the relevant statutes. An Order consistent with this Opinion will follow.